# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 22, 2005          Decided July 5, 2005
Reissued October 19, 2005

No. 03-7143

MINNIE SMITH,
APPELLEE

v.

DISTRICT OF COLUMBIA,
APPELLANT

GAIL L. TURNER, ADMINISTRATOR, YOUTH SERVICES
ADMINISTRATION, ET AL.,
APPELLEES

Appeal from the United States District Court
(USDC) for the District of Columbia
(No. 00cv00894)

*Donna M. Murasky*, Senior Assistant Attorney General, argued the cause for appellant. With her on the briefs were *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General.

*Leon Dayan* argued the cause for appellee Minnie Smith. With him on the brief were *Robert M. Weinberg*, *W. Gary Kohlman*, and *Laurence S. Gold*. *Abigail V. Carter* entered an

2

appearance.

Before: GINSBURG, *Chief Judge*, and EDWARDS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Chief Judge* GINSBURG.

TATEL, *Circuit Judge*: Sometime after 11 p.m. on April 28, 1999, an unidentified assailant shot and killed seventeen-year-old Tron Lindsey and his roommate in the apartment where they lived as part of a program for delinquent youths in the District of Columbia's legal custody. Alleging among other things that the District, by virtue of its deliberate indifference in selecting and monitoring the program provider, had violated Tron's substantive due process rights, Tron's grandmother brought suit as next of kin and on behalf of his estate. After a twelve-day trial, the jury found the District liable and awarded damages of $72,000. Because Tron's grandmother "proffered 'sufficient evidence upon which a jury could properly base a verdict' in her favor," *Mackey v. United States*, 8 F.3d 826, 829 (D.C. Cir. 1993) (quoting *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 828 (D.C. Cir. 1988)) (emphasis omitted), we affirm.

**I.**

The District of Columbia has several ways of dealing with delinquent youths. It places many in the Oak Hill Youth Center—a juvenile detention facility with a history of problems so serious that even the District has called it a "troubled program." *See District of Columbia v. Jerry M.*, 738 A.2d 1206, 1212 (D.C. 1999). It places others in programs geared to youths who have committed less serious crimes or seem relatively likely to stay out of trouble. Such programs include "independent living" programs—the focus of this case—in

which youths live on their own in program-provided apartments, though subject to restrictions on their activities and supervision by staff.

Rather than running its own independent living program, the District contracts the work out to private companies. Although a 1986 D.C. law required the Mayor to promulgate rules for providers of residential facilities for District juveniles, *see* D.C. Code § 7-2103; *see generally id.* §§ 7-2101 to 7-2108 (codifying the Youth Residential Facilities Licensure Act of 1986), the Mayor failed to develop any such rules for independent living programs prior to the events leading to this case. Absent such rules, no minimum standards were required of District providers generally, and the city's Youth Services Administration (YSA) had, in the words of its Administrator Gail Turner, "no specific standards" for selecting providers. Tr. 3/17/03 at 32.

Viewed in the light most favorable to Tron's grandmother, Minnie Smith, *see, e.g., Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999) (per curiam) (holding that we view the evidence in the light most favorable to the prevailing party), the record reveals the following events: In early 1998, the company the District had contracted with to operate an independent living program for delinquent youths folded due to allegations of tax fraud. A former employee of that company, James Jones, formed a new company, Education Solutions Academy (ESA), intending to seek the District's business. Although Jones had worked at a school run by the contractor before its collapse, no record evidence suggests that he had any experience with independent living programs. Jones hired a program director, Eric Antonio, who did have experience with at-risk youths but, like Jones, had never before worked at an independent living program—as he acknowledged, he "did not know that much about" such programs. Tr. 3/12/03 at 67.

As the site for their program, Jones and Antonio selected

Queenstown Apartments in Mt. Ranier, Maryland. Located fairly close to a Metro stop and grocery stores, this complex struck them as a good place for the youths to live, and they thought its easy access to D.C. would facilitate weekend home visits. The complex had over 1000 units, arranged in a "garden-style" layout with every few units sharing the same main door to the outside. Although the complex had several security cameras, the main doors had none. Nor did these doors have locks. Doors leading into individual units did have locks, as well as peepholes, but record evidence suggests that poor hallway lighting made the peepholes useless. At trial, an expert testified that factors like "low lighting; no locks or very few locks; no accountability; no guard services; no guard personnel watching the area, all of which was the case at Queenstown" tend to attract drug crimes. Tr. 3/18/03 at 103. Another expert testified that Queenstown Apartments "ha[d] been an open air drug market for at least 15 years" prior to 1998. Tr. 3/14/03 at 6.

During their site selection process, Antonio and Jones met with a Queenstown Apartment manager but asked no questions about safety or security, as Antonio conceded at trial. Nor did they inform the manager that youths in their program would be adjudicated delinquents. Despite Queenstown's handful of security measures—such as offering two reduced-rent units to police officers—the manager testified that "we simply weren't equipped" to accommodate a program for juvenile delinquents. Tr. 3/21/03 at 96. The manager even acknowledged that Queenstown "would not have let the program on the grounds" had it known that the program's youths were juvenile delinquents. *Id.* at 147.

With Queenstown Apartments in mind as a site, ESA sought a contract from YSA. YSA's point person for the approval process was a social worker, Kenneth King. Because the District had failed to develop criteria for evaluating contractors,

*see supra* at 3, King had no standards against which to judge ESA's proposal. Along with other social workers, King met with Jones and Antonio, but never asked whether either had prior experience with independent living programs. Nor did he inquire whether ESA had a Maryland license to operate an independent living program involving minors. Had he done so, he would have discovered that ESA lacked the necessary license. Although King twice visited Queenstown Apartments, he neither met with Queenstown officials nor made any inquiries about safety or security.

Acting on King's recommendation, YSA signed a contract with ESA in November 1998. (Less than a year later, King quit his YSA job to become ESA's CEO at an annual salary of $84,000.) During its first year of operation, ESA had up to sixteen youths living at Queenstown Apartments at any given time. For each youth it received $110 per day from the District.

Seventeen-year-old Tron Lindsey was one such youth. Due to his parents' drug problems, he had grown up with his grandmother. Some time after moving out of her house, he was arrested for hitting and kicking a man, charged with assault, found guilty, and placed at the Oak Hill Youth Center. In February 1999, a D.C. Superior Court probation officer recommended that Tron be taken out of Oak Hill and placed in an independent living program. The officer made this recommendation on the basis of several factors, including Tron's "very limited court involvement," his wish to complete his education, and his own preference for an independent living program as opposed to more time at Oak Hill. Tr. 3/20/03 at 69, 70. Accepting this recommendation, the court placed Tron with ESA—a placement that only another court order could change.

Arriving at ESA's Queenstown site in early March, Tron was assigned to an apartment unit with another youth, Tyrone Wallace. As part of the program, Tron attended life skills workshops run by either Antonio or another ESA counselor.

With Antonio's help, Tron began spending several hours a day at Covenant House, an educational program aimed at helping at-risk youth. Although Tron could only get on the waiting list for some Covenant House classes, he convinced one of its employees to set up an independent study for him and another ESA youth. The employee explained that while she wouldn't do this for everyone, Tron impressed her. Tron "expressed a real, particular desire that seemed very sincere . . . . He was a very polite young man. He was cooperative. He was courteous, and for myself I know that I will often time go the extra step for someone who acts like this is what they want." Tr. 3/12/03 at 128.

ESA required all youths to obey a 7 p.m. curfew. After that hour, they were neither to leave their apartments nor to let anyone in except ESA staff. But at least in Tron's case, this requirement was virtually never observed. Record evidence suggests that out of the fifty-one days Tron spent at ESA, he missed his curfew fifty times. As Antonio put it, "[h]e usually showed up anywhere after 7:00 to as late as 11:00. He would usually be there the next morning." Tr. 3/13/03 at 12. According to Antonio, although ESA docked Tron's allowance (which ranged from $15 to $25 a week), it never otherwise punished him. Antonio acknowledged, however, that Tron might have gotten sent back to Oak Hill if he had continued to violate the curfew.

Uncontrolled curfew violations were not ESA's only problem. During Tron's brief time at Queenstown, ESA had to release one counselor (a man with a criminal record) due to poor performance and rumors that he was buying marijuana from ESA youths. ESA also knew the man's replacement had a criminal record involving drugs (specifically, although ESA sought no details, a conviction some years past for PCP possession with the intent to distribute). Additionally, ESA failed to monitor the crime rate at Queenstown Apartments. "It

just didn't occur to me at the time to do that," Antonio explained. Tr. 3/12/03 at 108. Had ESA kept tabs, it would have learned that recent crimes committed on the premises included an October 1998 robbery by a man with a gun, an October 1998 robbery and assault by two masked men with guns, a November 1998 robbery and assault, a November 1998 robbery and assault by two men with guns, a December 1998 burglary, a December 1998 assault, and a February 1999 robbery by a man with a gun.

The District did little to monitor ESA's problems. It neither looked into whether ESA was tracking site safety nor held the company to any staffing standards. As Turner acknowledged, YSA had "no standards . . . as to qualifications that were necessary for the counselors to work in the program." Tr. 3/17/03 at 35. Although a YSA social worker was generally on notice of Tron's curfew violations, nothing in the record suggests she saw this as a concern worth pursuing.

Similarly—and even more significantly—the District took no noteworthy steps in response to two violent assaults on ESA youths. First, in early February 1999, an ESA youth was murdered while visiting his family during a home visit made in violation of ESA rules. The District official reviewing the murder was "[u]nable to determine" whether D.C.'s related statutes and policies were adequate, Pl.'s Ex. 32, and the investigation went no further. Then, in early April 1999, an ESA youth was mugged and robbed at his apartment by an armed assailant after curfew. At the time, the youth was violating curfew because he had another ESA youth (also violating curfew) visiting in his apartment.

On the night of April 28, 1999, in violation of their curfew, Tron or Tyrone (the record does not conclusively show which) let a visitor into their apartment sometime after 11 p.m. Using a silencer-equipped gun and firing single shots to the head, the visitor killed both youths. The murders, which brought the

death toll of ESA youths to three out of sixteen (a fourth would be murdered by the end of the year), were never solved. At trial, the homicide detective in charge of the case testified that the murders resulted from a targeted killing. The detective testified that he thought Tyrone was shot first and that when criminals use silencers, typically "the first person [they] shoot is going to be the subject that [they] are probably looking for." Tr. 3/13/03 at 106; *see also id.* at 145-46.

Succeeding Tron's parents in interest, his grandmother Minnie Smith sued various parties including the District, Gail Turner, Queenstown Apartments, and ESA (renamed Re-Direct, Inc., because its original name was improper under Maryland law) in U.S. District Court for the District of Columbia. Smith brought substantive due process claims against the District and ESA pursuant to 42 U.S.C. § 1983 and negligence claims against all defendants. The district court rejected the District's motion for summary judgment on the substantive due process claim and the case went to trial. *See Smith v. District of Columbia*, No. 00-0894, slip op. at 7-14 (D.D.C. Nov. 18, 2002).

After the close of Smith's case, which developed the facts discussed above and included expert testimony, the District moved for a directed verdict, which the court denied with prejudice. Following presentation of defendants' case, the jury found that both the District and ESA had violated Tron's substantive due process rights. The jury also found the District and ESA liable for negligence that proximately caused Tron's death, but determined that neither Queenstown Apartments nor Turner had acted negligently. It awarded just over $72,000 in damages. Only the District filed a post-verdict motion for judgment as a matter of law, which the district court denied, *see Smith v. District of Columbia*, No. 00-0894 (D.D.C. Sept. 11, 2003), and only the District now appeals. For the District to prevail fully, it must do so on both the due process and negligence counts; by contrast, if Smith prevails on the section

1983 count, she will receive the full award.

## II.

We begin with the applicable legal standard. Because a stranger—not a government agent—murdered Tron, the District can have committed a constitutional violation only if it had an affirmative obligation to protect Tron from harm. As the Supreme Court explained in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196 (1989), "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *Cf. Martinez v. State of California*, 444 U.S. 277, 283-85 (1980) (finding that state parole board had no particular constitutional obligation to an individual killed by a paroled prisoner). That said, the Court has recognized that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 198. Such individuals include prisoners, *see Estelle v. Gamble*, 429 U.S. 97 (1976), and mental patients involuntarily committed to state facilities, *Youngberg v. Romeo*, 457 U.S. 307 (1982). In such cases, governmental "deliberate indifference" may shock the conscience sufficiently to violate due process. *See Fraternal Order of Police Dep't of Corrs. Labor Comm. v. Williams*, 375 F.3d 1141, 1145-46 (D.C. Cir. 2004). *DeShaney* explained why:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to

provide for his basic human needs . . . it transgresses the substantive limits on state action set by the . . . Due Process Clause.

489 U.S. at 199-200; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). Conversely, deliberate indifference will not violate due process where the state has no "heightened responsibility toward the individual." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001). *DeShaney* was just such a case. There, the plaintiff argued the state had a heightened responsibility to a child whom it had reason to suspect was being abused by his father. Because the child remained in his parent's custody, however, the Court found that no such responsibility existed and that the state therefore committed no constitutional violation by failing to respond to the abuse. *See id.* at 201-02. In a footnote, the Court added that had "the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* at 201 n.9. Observing that several circuits had reached that very conclusion, the Court "express[ed] no view on the validity of this analogy." *Id.*

This case presents a scenario close to the one described in the *DeShaney* footnote. Tron was an adjudicated delinquent whom the District had, by affirmative exercise of its police power, placed with its agent, ESA, through a court order revocable only by another court order. According to Smith, the District thus had sufficient custody over Tron to impose upon it a constitutional duty not to act indifferently with respect to his welfare. "[E]xercise of [the District's] custodial power to dictate the terms" of Tron's "living arrangements" through a court order deprived him of "liberty to choose his own living arrangements." Appellee's Br. at 23. The District sees the case very differently. Acknowledging that "to be sure, Tron was in

the District's legal custody," Appellant's Br. at 28, it argues that nonetheless Tron "cannot meaningfully be said to have been in the District's custody when he was murdered," *id.* at 27. We agree with Smith.

For starters, the District's legal custody over Tron is a good indicator that it had a duty to look after him. Because the District, rather than Tron's family, had primary legal control over him, the District had legal responsibility for his daily care. *Cf. Reno v. Koray*, 515 U.S. 50, 63 (1995) (noting the power the government has over those in its legal custody). The District downplays the significance of this point, but our case law recognizes the relevance of formal indicia in assessing whether custody attaches for *DeShaney* purposes. In *Harris v. District of Columbia*, 932 F.2d 10, 14 (D.C. Cir. 1991), we held that District police officers had no clearly established affirmative duty to someone they were transporting to the hospital because he "had not been formally committed, either by conviction, involuntary commitment, or arrest, to the charge of the District" prior to the drug overdose that triggered his need for help. In contrast to the facts of *Harris*, at the time Tron was murdered, he was "someone whom [the District] ha[d] already formally committed to its custody," *id.* at 15.

Just as important, the District's control over Tron restrained his liberty against his will. An adjudicated delinquent placed at ESA by a restrictive court order, Tron had to participate in the program. To be sure, Tron had more freedom than a prisoner—subject to ESA rules, he could come and go, and take ESA-approved weekend home visits. ESA's failure to crack down on Tron's curfew violations also left him with a longer leash than he was formally entitled to under the program's rules. But such flexibility hardly amounts to freedom from state restraints. Tron had to live at Queenstown Apartments. He had no choice. He risked punishment, including the possibility of returning to Oak Hill, when he failed to obey ESA restrictions

on how and where he spent his time. The District had "restrain[ed his] freedom to act on his own behalf,'" *DeShaney*, 489 U.S. at 200, and held him subject to its control.

The District insists that Tron's liberty was unconstricted because at his court hearing he had expressed a preference for ESA over Oak Hill. But Tron could choose only between a greater restraint and a lesser one. As District counsel acknowledged at oral argument, he could not walk free. Whether he preferred ESA or Oak Hill, he would remain a juvenile delinquent held "against his will," *id.*, like the prisoner in *Estelle*, 429 U.S. 97, and the involuntarily confined mental patient in *Youngberg*, 457 U.S. 307. In this respect, he differed sharply from plaintiffs in *Powell v. District of Columbia*, 634 A.2d 403 (D.C. 1993), a case relied on by the District as persuasive authority. There, the D.C. Court of Appeals found that the District had no affirmative duty towards a homeless family whom it had provided with shelter. The court relied on the fact that no family member "was a ward or prisoner of the District, nor was the family's freedom of action curtailed." *Id.* at 410. Unlike these family members—who could go elsewhere if they objected to the shelter the District provided them—Tron was legally bound to participate in ESA and live at the site it provided. He could not have gone elsewhere even if, for example, he felt threatened by his roommate or his neighbors. For *DeShaney* purposes, he was thus in the District's custody, and the "Constitution impose[d] upon [the District] a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 200.

This conclusion finds support in decisions (like those cited in *DeShaney*, 489 U.S. at 201 n.9) holding that children in foster care are in state custody for substantive due process purposes and accordingly that in placing them in foster homes and monitoring their progress, the state owes them a constitutional duty of care. *See Doe v. New York City Dep't of Social Servs.*,

649 F.2d 134, 141-42 (2d Cir. 1981); *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000) (en banc); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475-76 (6th Cir. 1990); *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Yvonne L. v. N. M. Dep't of Human Servs.*, 959 F.2d 883, 890-93 (10th Cir. 1992); *Taylor v. Ledbetter*, 818 F.2d 791, 796 (11th Cir. 1987) (en banc); *see also Hernandez v. Tex. Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004) (assuming such a duty); *K.H. v. Morgan*, 914 F.2d 846, 851-52 (7th Cir. 1990) (only reaching duty to place, not duty to monitor). *But see Milburn v. Anne Arundel County Dep't of Soc. Servs.*, 871 F.2d 474, 476 (4th Cir. 1989) (holding that a state had no affirmative duty to a child placed voluntarily by his parents into foster care since "he was in the custody of his foster parents, who were not state actors" rather than in the state's custody). Like such children, Tron not only looked to the government as primary guardian of his needs, but, absent District approval, also lacked freedom to seek alternate arrangements—precisely the two circumstances courts have found create *DeShaney* custody in the foster care situation. As the Eighth Circuit explained, the state's duty arises because in "foster care, a child loses his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs." *Norfleet*, 989 F.2d at 293; *see also, e.g.*, *Taylor*, 818 F.2d at 795 (explaining that the state has an affirmative duty because foster children are "placed . . . in a custodial environment . . . [and] unable to seek alternative living arrangements").

While many of these foster care cases involved younger children, the principle remains the same: where the government assumes full responsibility for a child by stripping control from the family and placing the child in a government-controlled setting, the government assumes a duty for the child's welfare. Indeed, the Third Circuit has specifically applied this principle to older children. *Nicini*, 212 F.3d at 808 (finding that the state

owed a duty of care to an adolescent in foster care because even though "foster children, especially older ones, enjoy a greater degree of freedom and are more likely to be able to take steps to ensure their own safety," the state has nonetheless "by affirmative act, render[ed them] substantially 'dependent upon the state . . . to meet [their] basic needs'") (quoting *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1372 (3d Cir. 1992) (en banc)) (ellipsis in original). Similarly, we see no reason to treat Tron differently because he was a juvenile delinquent rather than a foster child. If anything, the difference cuts in Tron's favor, since it caused the District to commit him to a state actor (ESA) rather than a purely private party. *Cf. K.H.*, 914 F.2d at 851-52 (suggesting that a state may have a duty to monitor only if it places a child with state actors); *Milburn*, 871 F.2d at 476-77 (similar).

Unhappy with the foster-child analogy, the District urges us to look instead to decisions holding that public schoolchildren, despite compulsory education laws, are not in state custody for *DeShaney* purposes. *See, e.g.*, *D.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1373 (3d Cir. 1992) (en banc); *Doe v. Hillsborough Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc). *But see Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999) (suggesting, without deciding, that under certain circumstances a public school has a constitutional duty of care towards its students). Just as courts have found that compulsory schooling laws create no affirmative state duty, the District argues, so should we find that the District's restrictive placement of Tron at ESA gave rise to no affirmative duty on its part.

At least on the surface, we see some tension between the foster care and public school cases. Both involve state constriction of a child's liberty—the child must live with the foster parents and the child must receive schooling—yet only the former triggers *DeShaney* custody. Courts have typically

distinguished these cases by treating the custody analysis as an all-or-nothing inquiry: the government has either assumed primary responsibility for controlling and caring for a child (and thus, as in the foster care context, the child is always in government custody) or it has assumed only limited responsibilities for parts of the day (and thus, as in the school cases, the child is never in government custody). For example, the Third Circuit found no custody in the school context because "parents remain the primary caretakers," whereas in the foster care context "the state assumes an important continuing . . . responsibility for the child's well-being" and "the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs." *D.R.*, 972 F.2d at 1371, 1372. Similarly, the Fifth Circuit stressed that in the school context the "custody is intermittent," "the student returns home each day," and "[p]arents remain the primary source for the basic needs of their children." *Doe*, 113 F.3d at 1415; *see also Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (noting that "the parents, not the state, remain the child's primary caretakers").

But we need not explore the ins and outs of this issue. For our purposes, it matters not at all whether *DeShaney* custody requires that the government be the child's primary caretaker, that the government constrict the child's liberty, or both. Nor does it matter whether *DeShaney* custody is an all-or-nothing affair or can instead, as the First Circuit has suggested, attach at intermittent times based on particular circumstances, *see Hasenfus*, 175 F.3d at 72. In Tron's case, like the foster care cases and unlike the public school cases, all these conditions were met. The District served as Tron's legal custodian and primary caregiver. It placed him in a program that constrained his liberty by limiting, among other things, where he lived and what he could do. Indeed, Tron was murdered while subject to these constraints—at Queenstown Apartments, at night, and during curfew. For *DeShaney* purposes, then, Tron remained in

District custody, and if the District was indeed deliberately indifferent to his welfare in a way that shocked the conscience and led to his murder, then the District committed a constitutional violation—the issue to which we now turn.

**III.**

In determining whether the jury could reasonably have found that the District violated Tron's due process rights, we view all disputed facts and draw all reasonable inferences in favor of Minnie Smith, the prevailing party. *Ekedahl*, 183 F.3d at 858. Pointing out that Smith prevailed against the District and ESA but not Turner and Queenstown, the District throws a twist into this standard of review, arguing that we must view all facts related to Queenstown and Turner in the light most favorable to those parties, while viewing all other facts in the light most favorable to Smith. But the District cites no authority for this novel proposition, nor have we found any. Had Smith appealed the jury's verdict in favor of Queenstown and Turner, we would view them as prevailing parties for purposes of Smith's appeal, but we see no reason why the District should benefit from all inferences to which Queenstown and Turner might have been entitled. Perhaps the District meant to argue that the jury verdicts were inconsistent. In civil cases where this argument is properly raised, it does impose a special obligation on the court to view the evidence in a manner that reconciles the verdicts if possible, and to grant a new trial if not. *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 615 (7th Cir. 1999). While we have serious doubts about whether to apply this standard where, as here, the issue is not properly raised, *see Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 63-64 (1st Cir. 2002) (holding that in order to preserve the issue a party must object to inconsistent verdicts prior to judgment being entered), we need not resolve that point since, as we explain below, *see infra* at 25-26, the verdicts are consistent.

The inconsistent-verdicts issue aside, we may reverse the district court's denial of the District's motion for judgment as a matter of law only if no reasonable jury could have found in Smith's favor. *Ekedahl*, 183 F.3d at 858. "[I]ntru[sion] upon the rightful province of the jury . . . is highly disfavored. We have repeatedly emphasized that '[t]he jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable [people] could not disagree on the verdict.'" *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (quoting *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 640-41 (D.C. Cir. 1988)) (third alteration in original). "[W]e cannot substitute our judgment for that of the jury; therefore, we neither assess witness credibility nor weigh the evidence." *Mackey*, 8 F.3d at 829.

Moreover, because the District raised its sufficiency-of-the-evidence arguments as to the due process claim only in its pre-verdict motion for judgment as a matter of law and not in its post-verdict motion, the most it can win is a new trial. *Frederick v. District of Columbia*, 254 F.3d 156, 160 (D.C. Cir. 2001); *but see Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 125 S. Ct. 1396 (Feb. 28, 2005) (No. 04-597) (granting certiorari to resolve the scope of an appellate court's review in such situations), *granting cert. to* 375 F.3d 1341 (Fed. Cir. 2004). Since, as we explain below, sufficient evidence supports the jury's verdict, we need not consider whether the District's failure to move for judgment as a matter of law at the close of its own case (as opposed to at the close of Smith's case) further limits our review "to considering whether the verdict is so unsupported by the evidence that allowing it to stand would constitute a manifest miscarriage of justice," *Frederick*, 254 F.3d at 162.

The District presents two fact-based challenges to the jury's verdict. First, it argues that the jury could not have reasonably

concluded that the District had a deliberately indifferent policy or custom under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978) (holding that municipal liability for purposes of claims brought under 42 U.S.C. § 1983 must stem from an unconstitutional policy or custom rather than simply from respondeat superior).  Second, it claims that even had such a policy or custom existed, the jury could not have reasonably found it to be a "moving force" (i.e., cause) of Tron's death.  We address each argument in turn.

*Deliberate Indifference*

While a government "policy or custom" is typically an affirmative act, government failure to set standards or train employees can sometimes amount to an unconstitutional policy or custom.  Considering a case where the plaintiff alleged that failure to train police to handle detainees with medical problems amounted to an unconstitutional municipal policy, the Supreme Court explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (footnote omitted).  Similarly, in this case Smith alleges that "the need for more or different" standards YSA employees could use in selecting and monitoring providers was "so obvious and the inadequacy so likely to result in the violation of constitutional

rights" that it amounted to a deliberately indifferent District policy. The District disagrees, but in order to prevail it must show that no reasonable jury could have reached that conclusion. Reviewing the record ourselves, we think sufficient evidence supports the jury's conclusion that the District's lack of standards amounted to a policy of deliberate indifference that shocks the conscience.

The record makes patently clear that the District had no criteria for selecting or monitoring providers like ESA. Indeed, the District does not claim otherwise. As the district court found, this lack of criteria related directly to the Mayor's violation of the District's Youth Residential Facilities Licensure Act, which, for twelve years before Tron's death, had required the promulgation of standards for youth residential facilities. *See* Tr. 3/25/03 at 200-02 (describing the Mayor's failure to promulgate standards and holding that the Act "very clear[ly]" applied to independent living programs). While the District's failure to follow its own law, standing alone, is insufficient for a constitutional tort, "it is far from irrelevant," *Doe*, 649 F.2d at 145. "The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring deliberate indifference from a failure to act." *Id.* at 146. Given the Youth Residential Facilities Licensure Act, the jury could have inferred that the District knew it needed standards for programs that housed troubled youths.

Even more significantly, uncontested testimony by Paul DeMuro, one of Smith's witnesses and an expert in juvenile justice and child welfare, established that the District's failure to have such criteria left it far below what national standards of care require of states and municipalities operating independent living facilities for juvenile delinquents. This held true with respect to both provider selection and monitoring.

As to provider selection, DeMuro called YSA's lack of criteria for selecting independent living providers "quite

unusual." Tr. 3/14/03 at 68. "[I]n most states," he testified, "when there is any kind of residential program or non-residential program, the public agency will have a set of standards or licensing regulations that they would go from to develop a contract with any provider." *Id.* He went on, "in terms of the kind of national standards, one would expect there would be . . . written criteria about [s]ite selection, written criteria, a stipulation about selection and training of staff, written criteria about the process of selecting kids and getting them prepared for independent living which is a very tricky deal when you are thinking about a 17 or 18 year old living semi-independently . . . [and a] written description of a quality assurance of the reporting system." *Id.* at 73-74. The need for such criteria, he explained, was particularly important in light of the "problematic" potential of having "a number of teens together, particularly juvenile justice youngsters." *Id.* at 79.

DeMuro also testified that ESA failed to meet national standards in a number of respects which the District, having no criteria, failed to discover during the selection process. Not only was ESA a "relatively new organization," but it lacked "anybody who had experience in independent living programs." *Id.* at 77. It even lacked the license it needed to operate, which the District "[a]bsolutely" should have determined, *id.* ESA employed counselors with drug records, who "should [have been] excluded" under national standards. *Id.* at 81. Additionally, DeMuro testified, national standards required the District to have criteria for researching and evaluating site safety. Absent such criteria, the District's review fell short. While "one can argue [about whether the site] was a high crime area or not," DeMuro testified, the District should have at least looked into this issue. *Id.* at 82-83. Instead, a District employee just "drove around the area a few times" and failed to do "a thorough enough check on what this location meant in terms of crime factors for kids." *Id.* at 83.

21

As to monitoring, DeMuro testified that the District similarly fell well short of national standards of care by failing to have an appropriate policy (or, indeed, any policy at all). "National standards . . . would say that there should be a monitoring system in place and that there should be quality assurance and a process whereby the jurisdiction that is monitoring the youngsters' behavior know[s] the program as it develops." *Id.* at 82. According to DeMuro, the District failed in virtually all aspects of its monitoring responsibilities. Lacking criteria, he explained, the "District failed to do a thorough job, do due diligence in terms of monitoring this particular program." *Id.* YSA had a "real problem" in how it dealt with incidents like Tron's repeated curfew violations, where ESA's failure to respond "sets up terrible expectations and consequences between the youngster and the program." *Id.* at 84. YSA had a "responsibility," *id.* at 90, which it failed to discharge, to make sure that ESA was keeping track of crimes in the complex, including the many that occurred prior to Tron's death, *see supra* at 7. YSA fell "woefully short" of national standards in how it dealt with the armed robbery of an ESA youth at his apartment: it failed to address either the fact that this incident involved two curfew violations or the reality of the violence that placed "at least two of the youngsters . . . in danger." Tr. 3/14/03 at 85-86. The District should have conducted a program review "from soup to nuts," and it should have done the same thing—"pretty quickly"—after the early February death of another ESA youth. *Id.* at 86. Instead, the District responded to that death, like the armed robbery, in a "tremendously inappropriate" manner. *Id.*

In sum, DeMuro testified that absent written criteria, the District's attempt to select and monitor its provider of independent living programs was analogous to "building a house without an architect." *Id.* at 68.

From such evidence, the jury could have reasonably concluded that "the need for more or different" standards for selecting and monitoring independent living programs for juvenile delinquents was "so obvious and the inadequacy so likely to result in the violation of constitutional rights" that it constituted a deliberately indifferent city policy or custom. *See City of Canton*, 489 U.S. at 390. In particular, the jury could have reasonably inferred from DeMuro's uncontested testimony that the lack of standards created grave risks to youths in District custody. Without standards—required both nationally and by the District's own law—YSA employees had no guidance for selecting and monitoring providers. Without standards, delinquent youths, a "tricky," "problematic," and at-risk population, could be sent to totally inappropriate programs run by unqualified counselors and located in unsafe areas. Without standards, these youths could then be left in such programs despite ensuing violence. Indeed, all these risks were realized when YSA chose ESA as a provider and subsequently failed to react to the murder of one youth and the armed robbery of another. In *Youngberg*'s words, the jury reasonably could have thought that the District's failure to have standards caused it to fall below the "minimally adequate or reasonable [protection required] to ensure safety," 457 U.S. at 319, for youths like Tron within its custody.

This conclusion finds support in cases holding that juries may infer deliberate indifference from the District's failure to have adequate safeguards for dealing with situations fraught with risk. In *Parker v. District of Columbia*, 850 F.2d 708 (D.C. Cir. 1988), a case brought by a man shot by District officers attempting to arrest him in Maryland, we held that the jury could infer deliberate indifference from the police department's failure to train officers adequately in disarmament and in extrajurisdictional arrest procedures. Expert testimony established that police training inadequately addressed problems unique to extrajurisdictional arrests and that, as an expert

"described[] and eventually demonstrated on [plaintiff's] counsel," well-trained police could have subdued the suspect without shooting him. *Id.* at 713-14; *see also Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4 (1st Cir. 2005). Just as in *Parker*, the jury here could have reasonably inferred from DeMuro's testimony that the District's lack of criteria fell well below acceptable norms. Indeed, this case is even stronger: whereas in *Parker* the police department offered at least some training related to disarmament and extrajurisdictional arrest, here YSA, in the words of its Administrator, had "no specific standards" *at all* for selecting and monitoring independent living programs, *see* Tr. 3/17/03 at 32.

In another case, *Morgan v. District of Columbia*, 824 F.2d 1049 (D.C. Cir. 1987), we concluded that the jury could have found deliberate indifference where the District's policy of overcrowding jails led it to put a prisoner with "violent tendencies" in a space with other prisoners, one of whom he then assaulted. *See id.* at 1058-59. We held that since the District had reason to be concerned about violence related to overcrowding, the jury could have reasonably inferred "that the District knew or should have known that its persistent method of operating the Jail increased the risk of violent harm to inmates." *Id.* at 1060-61. Like the jury in *Morgan*, the jury here could have reasonably inferred that the District acted indifferently not merely because its lack of criteria led it to send the youths to a program located at a dangerous site and run by inept counselors who failed to hold Tron and other youths accountable for violating program rules, but also because it failed to react—at all—to the murder of one ESA youth and the mugging of another, even though both incidents related directly to the program's deficiencies.

While we are persuaded that a jury could find deliberate indifference that shocks the conscience based on the facts of this case, the dissent, engaging in something akin to de novo review,

takes a different view. First, the dissent treats the District's lack of standards as "barely relevant" to whether it was deliberately indifferent to Tron's welfare because "it does not follow that ad hoc decisions are necessarily reckless." Dissenting op. at 6. But DeMuro's testimony, entirely ignored by the dissent, offers a clear basis for inferring that the District's lack of standards was reckless precisely because it was likely to lead to shoddy provider selection and monitoring. Of course, lack of standards might not *always* lead to bad provider-selection decisions—just as lack of training might not mean that officers *always* fail to disarm suspects—but that is a matter of causation. Second, the dissent considers the District's selection of ESA "largely irrelevant" because, in the dissent's view, "it is entirely possible that ESA, although inexperienced, ran the program adequately." *Id.* at 6. We agree that this is possible, but the record contains evidence from which a reasonable jury could reach a different conclusion, such as DeMuro's expert testimony that ESA had a "real problem" in dealing with repeated curfew violations, *see* Tr. 3/14/03 at 84. Third, the dissent concludes that "it is silly" to suggest that the District's approval of Queenstown Apartments as the program site could have been deliberately indifferent. Dissenting op. at 7. Were this approval deliberately indifferent, the dissent asserts, it would mean that all parents who had "chosen" to live at Queenstown were themselves deliberately indifferent to their children's welfare. *Id.* The dissent's logic not only depends on, among other things, the unsupported assumption that such parents have the choice (in the sense of having viable options) to select safe locales, but also implies that no area—no matter how high the crime rate—is inappropriate for the District to send children to, provided that at least some families live there. The dissent further suggests that Queenstown Apartments was relatively safe and—in a footnote—claims its residents faced less risk of serious crime than "the average resident" of the District. *Id.* at 8 & n.*. Here, the dissent both ignores record evidence and invokes statistics

neither presented to the jury nor subjected to cross-examination. The District never offered evidence as to D.C. crime rates. But Smith did offer expert testimony to the effect that Queenstown's reported crimes for 1998 "represent[ed] a high . . . amount of criminal activity in the community," *see* Tr. 3/14/03 at 49, and that Queenstown was "an area of high drug trafficking" and a "high crime area" in 1998 and 1999, *see* Tr. 3/13/03 at 183, *see also id.* at 194; Tr. 3/18/03 at 100-01. The dissent may disagree with these characterizations, but our role is limited to determining whether "sufficient evidence in the record [] support[s] the jury's verdict," *Williams v. First Gov't Mortgage and Investors Corp.*, 225 F.3d 738, 742 (D.C. Cir. 2000).

Finally, returning as promised to the question of verdict consistency, we see no inconsistency between the jury's verdict against the District and its verdicts in favor of Queenstown and Turner. We take the Queenstown verdict first. According to the District, because the jury found in favor of Queenstown Apartments, we must conclude that the site was safe and therefore that the District's lack of standards for site selection could not have amounted to deliberate indifference. Both the premise and the deduction are flawed. The jury could have reasonably found for Queenstown not because it thought the site safe, but because Queenstown Apartments had a significantly lower duty to the youths (landlord rather than guardian), lacked notice that these youths might prove particularly troublesome, and had undertaken at least some efforts to deal with rising crime rates. Moreover, even if Queenstown Apartments had marginally adequate safety systems, the District deserves no credit because, as King himself testified, the District never even investigated site safety.

As to Turner, not only was she the ninth YSA Administrator in sixteen years, but at the time of Tron's murder she had worked there for less than a year. Crediting her testimony that it typically "takes about twelve months to learn what the job is

and what the requirements are" for such positions, Tr. 3/17/03 at 26, the jury could have found that she did not act negligently when she failed to grasp YSA's need for standards for residential youth programs. This is particularly plausible given Turner's testimony that dealing with other juvenile facilities occupied most of her time. She had to address YSA's recent closure of two facilities pursuant to court order, its payment of $3 million in fines relating to overcrowded facilities, and "conditions of confinement [that] were said to have been deplorable." *Id.* at 65. Turner thought it a "success story" that YSA was not in receivership. *Id.* at 66.

*Moving Force*

A deliberately indifferent policy or custom is "deemed to be the moving force of a constitutional injury if the 'conduct is a substantial factor in bringing about the harm.'" *Parker*, 850 F.2d at 714 (quoting *Morgan*, 824 F.2d at 1062-63). The policy or custom must be "closely related to the ultimate injury," and the court should inquire whether "the injury [would] have been avoided" in its absence. *City of Canton*, 489 U.S. at 391. We have equated moving force with proximate cause. *Morgan*, 824 F.3d at 1058; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 833 n.9 (1985) (Brennan, J., concurring). Proximate cause "includes the notion of cause in fact," W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 30, at 165 (5th ed. 1984), and requires an element of foreseeability, *see id.* § 42, at 273-74.

Although "'the proximate cause of an injury is ordinarily a question for the jury,'" *Hicks v. United States*, 511 F.2d 407, 420 (D.C. Cir. 1975) (citation omitted); *see also, e.g., Rieser v. District of Columbia*, 563 F.2d 462, 480 (D.C. Cir. 1977), the District asserts that the jury here could not have reasonably concluded that its lack of standards was a moving force behind Tron's death. As to cause-in-fact—the requirement that Tron's

death "would not have occurred but for [the District's] conduct," *see* Keeton et al., *supra*, § 41, at 266—the District claims that "it cannot fairly be said that . . . there was an affirmative link between" Tron's death and the District policy or custom. Appellant's Br. at 33. Unwilling to rest entirely on this claim, the District continues: "[a]t worst, YSA's selection of ESA to run an independent living program at Queenstown was a 'but for' cause of his death." *Id.* at 33. In the District's view, it could not have foreseen Tron's death: "it was too remote a consequence of the District's inaction; there is no suggestion that Tron's assailant was an agent of the District; and the District was unaware that Tron (or his roommate) had been targeted for murder." *Id.* at 33-34.

Again viewing the record in the light most favorable to Smith, we conclude that the jury could have reasonably found both cause-in-fact and foreseeability. Cause-in-fact is straightforward. The jury could have reasonably inferred from DeMuro's testimony that if the District had adopted proper standards, either it would never have selected ESA as a provider (particularly given the inexperience of ESA employees) or it would have required ESA to take additional steps to ensure Tron's and the other youths' safety, such as tightening curfew enforcement and arranging for more security for their apartments—particularly in the wake of the after-curfew armed robbery of one youth earlier that spring. From this inference, the jury could further have concluded that had the District taken these proper precautions, Tron would have lived. Indeed, DeMuro saw a "direct causal link" between the District's failure to follow national standards of care and Tron's death. Tr. 3/14/03 at 90-91.

As for foreseeability, the "defendant may be held liable for harm that is foreseeably attributable to his conduct as well as for unforeseeable harm attributable to his conduct, unless it appears that the chain of events is highly extraordinary in retrospect."

*Parker*, 850 F.2d at 714 (internal quotation marks and citation omitted). Here, the jury could have easily found that the District's lack of criteria for site safety, provider experience, and program monitoring led foreseeably to unsafe providers, which in turn led foreseeably to youths becoming victims of crime. Indeed, an expert testified that in light of the Queenstown crime rate alone, the murders of Tron and Tyrone were "very predictable, very foreseeable." Tr. 3/18/2003 at 98. The causal connection resembles that in *Morgan*, 824 F.2d at 1063, where we held that the jury had a reasonable basis for concluding that the District's deliberate indifference to overcrowded prison conditions led foreseeably to increased fighting among inmates which in turn led foreseeably to increased injuries. *See also Parker*, 850 F.2d at 714 (holding that failure to train officers to disarm suspects rendered foreseeable the injuries to a suspect shot by an officer who did not attempt to disarm him). Indeed, the earlier crimes against ESA youths made the risks to Tron and the others all the more foreseeable.

The District suggests that even if danger to the youths' safety was a foreseeable consequence of its deliberate indifference in selecting providers, it nonetheless had no way to have foreseen that a program youth would be targeted for murder. In a similar vein, the dissent concludes that because we do not know who killed Tron, his murder was not foreseeable. *See* dissenting op. at 9. We disagree with both points. Adjudicated delinquents, ESA youths had criminal records and likely connections to dangerous characters. Given their backgrounds, it is unsurprising that lack of supervision—especially combined with a questionable site location—would not only increase the likelihood they would become victims of random violence, but also make them more likely to engage in behavior that put them at risk of targeted violence. As Turner herself put it, "many of these [delinquent] young people put themselves in harm's way and don't act appropriately many times . . . . [B]ecause of their life

experiences and how they live, and what they are sometimes attracted to, they are at higher risk of having things done to them." Tr. 03/17/03 at 86. We may not know who killed Tron or why, but a reasonable jury could have found such targeted killings foreseeable in light of the District's failings and at any rate "not highly extraordinary in retrospect," *Parker*, 850 F.2d at 714; *see also Morgan*, 824 F.2d at 1063.

## IV.

In sum, we conclude that sufficient evidence supports the jury's verdict as to Smith's substantive due process claim. This is not a case where "the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable [people] could not disagree on the verdict." *Boodoo*, 21 F.3d at 1161 (quoting *McNeal*, 836 F.2d at 640-41). Because Smith received no separate damages from her common law negligence claim, we have no need to consider the District's challenges to its liability on that count. We affirm the district court's denial of the District's motion for judgment as a matter of law.

*So ordered.*

GINSBURG, *Chief Judge*, dissenting:  The Court today holds the District of Columbia violated the substantive component of the Due Process Clause of the Fifth Amendment to the Constitution of the United States based upon a murder that, as far as the evidence shows and common sense dictates, the District could neither have foreseen nor, by taking reasonable precautions, prevented.  I therefore join neither the opinion nor the judgment of the Court.

## I.  Background

The evidence, viewed most favorably to the appellee, tells a story that is not especially complex.  Tron Lindsey ran away from home at the age of 15 and thereafter lived on his own for about two years, during which time he kept out of trouble with the law.  In 1998, Lindsey, then 17, was arrested for assault, adjudged a delinquent, and placed in the District's Oak Hill Youth Center.

The following year his case was assigned to Joyce Bradford, a Superior Court probation officer, who found Lindsey "wanted to complete his education" and was "pursuing his GED at Oak Hill"; had "very limited court involvement"; and "very much wanted to be independent, because he had lived in the community for approximately two years on his own."  Bradford concluded it was not feasible to place Lindsey with either his mother or his grandmother, Minnie Smith.  Accordingly, she recommended, and the court agreed, that Lindsey be placed in a supervised independent living program, which would enable him both to complete his education and to get a job.

Lindsey was enrolled in the program run by Educational Solutions Academy (ESA) at the Queenstown Apartments in

Prince George's County, Maryland, in March 1999, three months before his 18th birthday. Lindsey's participation in the program appeared to pay immediate dividends: He entered a program at Covenant House for at-risk youth; met with an on-site social worker; scheduled an independent study program; and filled out job applications. To be sure, Lindsey's performance was not unblemished: He often left his study program early and regularly failed to return to his apartment before his curfew of 7:00 p.m. Those infractions, however, went neither unnoticed nor unaddressed by ESA and nothing in the record suggests Lindsey transgressed in any way that might have endangered his life. To the contrary, the record shows Lindsey, nearly an adult, was succeeding admirably in an independent living environment when he was murdered.

Unfortunately we know little about Lindsey's murder. Lindsey and his roommate were found dead in their apartment on April 29, 1999, each with a single gunshot to the head fired from a gun with a crude silencer attached. The assailant, whose identity remains unknown, was admitted to the apartment without the use of force. Significantly, the police concluded the murder was targeted but they could not confidently determine whether the target was Lindsey or his roommate, and the evidence in this case sheds no light upon that question.

Lindsey's grandmother, Minnie Smith, acting on behalf of his estate, sued ESA, the Queenstown Apartments, the District of Columbia and the District employee who ran the Youth Services Administration, which oversaw the independent living program, seeking damages under 42 U.S.C. § 1983 for a violation of substantive due process and for negligence under the common law of the District. The jury, finding the District and ESA had both violated the due process clause and been negligent, awarded Smith $72,000 in damage. The Queenstown

Apartments and the District employee were held not liable.

## II. Analysis

On appeal the District argues Smith failed to prove both her constitutional and her common law claims. Because, as the Court notes, Court Op. at 8-9, each claim would individually support the entire award of damages, I consider them both.

### A. The Due Process Claim

In order to prove her claim under the due process clause, Smith must establish (1) the District owed Lindsey a duty of care; (2) the District breached that duty by an act exhibiting deliberate indifference to Lindsey's well-being "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); and (3) a District policy or custom was the "moving force behind the alleged constitutional violation," which requires showing either that Lindsey's murder was foreseeable or that it was not "highly extraordinary in retrospect," *Parker v. Dist. of Columbia*, 850 F.2d 708, 714 (D.C. Cir. 1988).

### 1. The District's Duty

In ordinary circumstances "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849. "[W]hen the State takes a person into its custody and holds him there against his will," however, the substantive component of the due process clause "imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S.

4

189, 199-200 (1989). More specifically, "when the State ... so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action" set by the Constitution. *Id.* at 200.

I agree with the Court that, because he was required to live at the Queenstown Apartments, Lindsey was to that extent in the "custody" of the District, and the District therefore owed him a "corresponding duty." Because there are degrees of restraint within the concept of custody, the duty imposed by the Constitution is also one of degree: If the restraint of a person's liberty is tight, then the duty of the state to provide for his well-being is correspondingly elevated, *cf. Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc) ("foster children [are] under the umbrella of protection afforded by the fourteenth amendment" because they are "isolated" and "helpless"; without "investigation, supervision, and constant contact ... a child placed in a foster home is at the mercy of the foster parents"), whereas if the restraint is loose, then the duty is correspondingly lower, *cf. D.R. v. Middlebucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1373 (3d Cir. 1992) (en banc) ("compulsory attendance laws [do] not liken school children to prisoners and the involuntarily committed, both of whom are unable to provide for their own basic human needs").

With this proportionality in mind, I agree with the District's observation that ESA, when it constrained Lindsey to live in the Queenstown Apartments, hardly "render[ed] him unable to care for himself." Lindsey sought out the program precisely in order to enjoy the freedom it offered -- to go to school, to get a job, and to live independently -- and Ms. Bradford recommended he be placed in the program because he was not in need of a more

restrictive regimen. It is also worth recalling that when Lindsey began the program he was well-nigh an adult and had already lived on his own for two years; while living at the Queenstown Apartments, from which he would be able to come and go for school and work, Lindsey was not a helpless ward of the District. To be sure, Lindsey was not free to quit the program, as the Court repeatedly points out, Court Op. at 5, 11, and 15, but that establishes only that he was in custody -- not that he was so restrained that the District had a duty to guard him against any and all harms, including his improbable targeted murder. *See DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers [the youth] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them"); *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 100 (N.Y. 1928) ("The risk reasonably to be perceived defines the duty to be obeyed").

2. Deliberate Indifference

Nor did Smith prove the District exhibited such "deliberate indifference" to Lindsey's welfare as to "shock the contemporary conscience." *Fraternal Order of Police Dep't of Corrs. Labor Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004).[*] Smith argues the District showed such indifference

---

[*] The Supreme Court has held that "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer ... may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. "Whether the point of the conscience shocking is reached when injuries are produced with culpability ... following from something more than negligence but less than intentional conduct ... is a matter for closer calls." *Id.* at 849. Because not every instance of deliberate indifference may fairly be "condemned as conscience shocking," *id.*

because it "fail[e]d to develop and issue any standards ... to govern the [ESA program]." That, however, is barely relevant to whether the District breached its duty to Lindsey. A standard may facilitate consistent decisionmaking, but it does not follow that ad hoc decisions are necessarily reckless. The truly relevant inquiry is whether the District made any ad hoc decision that exhibited deliberate indifference to Lindsey's well-being.

Smith's allegations regarding the District's selection of ESA as a provider are also largely irrelevant. There is record evidence ESA was not experienced in operating an independent living program but Smith must still show ESA took or failed to take some action that exhibited deliberate indifference to the enrollees' safety, as it is entirely possible ESA, although inexperienced, ran the program adequately. Smith's contention that ESA failed to enforce Lindsey's curfew does not suffice because the record establishes ESA docked Lindsey's allowance in an attempt to deter curfew infractions.

The only relevant decisions identified by the Court are the District's approval of ESA's selection of the Queenstown Apartments to house program enrollees and its failure to monitor crime at the Queenstown Apartments. As for the site selection process, the Queenstown Apartment complex was chosen because it was a "blue collar community" in a "pretty decent neighborhood" that was "family-oriented," and near the amenities necessary for independent living. Indeed, an ESA director had lived within walking distance of the Queenstown Apartments for five years. Smith's key witness testified only that the site selection process should have been more

at 850, the question here is whether the District exhibited deliberate indifference to Lindsey's well-being and if so, whether that indifference is shocking to the "contemporary conscience."

"thorough." But surely deliberate indifference, like ambition, must be made of sterner stuff.

In any event, it is silly to suggest the District showed deliberate indifference to Lindsey's safety by approving Lindsey's placement at the Queenstown Apartments, which has 1,067 units, presumably rented to householders who -- apart from the ESA participants in eight or nine apartments -- had chosen to live there. Does Smith, or for that matter the Court, truly mean to suggest that any parent who housed his or her family in that complex exhibited deliberate indifference to their well-being? That seems the unavoidable implication of the plaintiff's argument.

Smith also says the complex was "inundated" with violent crime around the time of Lindsey's murder, which the District would have known had it monitored the ESA program more closely. As a foundation for this assertion Smith points to all of seven robberies and assaults committed at the complex during the seven months October 1998 through April 1999, including one robbery of an ESA participant. The record makes clear, however, ESA did not turn a blind eye to the crime against the ESA participant; rather, it assisted him in reporting the crime to the police despite some evidence suggesting it was staged. The remaining six crimes, spanning a period of seven months, could hardly have put either ESA or the District upon notice of any heightened need to guard Lindsey against violent crime. After all, the jury found the Queenstown Apartments was not liable for Lindsey's murder, presumably because Queenstown residents enjoyed a reasonable level of security.[*]

---

[*] For perspective, note that if we make the conservative assumption that only 2,000 people inhabited the 1,067 units at the apartment complex, then Smith's data show the probability of a

In the final analysis, regardless whether the selection of a site could have been more "thorough" or the District could have monitored crime at the complex more closely, it is obvious the District's actions did not amount to an "executive abuse of power ... which shocks the conscience." *Williams*, 375 F.3d at 1145.

3.  Moving Force

Even if the District had breached its duty to care for Lindsey, Smith's claim would still fail because any such breach was not the "moving force" behind Lindsey's murder. As the Court notes, Court Op. at 26, we have equated that requirement with proximate causation, which means "the particular [wrong] was 'foreseeable', that is, likely enough to follow from the defendant's [breach] to justify holding him responsible." *Doe v. Dominion Bank of Wash., N.A.*, 963 F.2d 1552, 1563 (D.C. Cir. 1992) (Williams, J., concurring). Whether a particular harm is foreseeable ordinarily turns upon the level of generality at

_____

Queenstown resident being the victim of a violent crime over a one-year period was .6%, or one in 166. Meanwhile, the average resident of the District faced almost three times that risk (1.6%), or one in 62. According to the D.C. Metropolitan Police Department, in 1999 residents of the District were the victims of 8,449 violent crimes -- homicides, forcible rapes, robberies, and aggravated assaults, *see* Citywide Crime Statistics, Annual Totals, 1993-2004 *available at* http://mpdc.dc.gov/mpdc/cwp/view,a,1239,q, 547256,mpdcNav_GID, 1556.asp, at a time when, according to the D.C. Office of Planning, the District had a population of 519,000. Population and Rates of Selected Components of Change, April 1990-July 1999 *available at* http://www.dclibrary.org/sdc/pop-comp-change-rate.html. Accordingly, a District resident faced a 1.6% probability (8,449 ÷ 519,000 = 0.016) of being the victim of a violent crime that year.

which the harm is defined, but Smith cannot sustain her burden of proof even at a high level of generality because there is no evidence in the record regarding the cause of Lindsey's murder: We do not know who killed him or why. It is therefore fanciful to maintain his murder was a foreseeable result of the District's failure to enact standards for independent living programs, or to monitor crime levels at the Queenstown Apartment complex more closely, or of ESA's failure more strictly to enforce Lindsey's 7:00 p.m. curfew. Indeed, the little we do know about Lindsey's murder suggests that no reasonable program standards and not even perfect curfew observance would have made his untimely death any less likely. Nor does it seem Lindsey's death by an assassin whom he or his roommate admitted into their apartment at 11:00 p.m. could have been prevented by any reasonable security measure.

Taking a wider view, we see also that Lindsey had no significant criminal history, had no known involvement with any dangerous activity, and seemed to be benefitting from the ESA program. Not even with 20-20 hindsight can one connect any nonfeasance on the part of the District to Lindsey's becoming the victim of a targeted murder -- and of course, the District is to be held to a standard of reasonable foresight, not of hindsight. *Cf. Martinez v. California*, 444 U.S. 277, 285 (1980) (state did not violate due process clause when parole board released prisoner who five months later committed murder because that was "too remote a consequence of the parole officers' action").

B.   The Negligence Claim

Smith's claim under D.C. law fails for one of the same reasons her claim under the Constitution fails. "The elements of a common law action for negligence are (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty by the

defendant, and (3) damage to the plaintiff, proximately caused by the breach of duty." *Powell By and Through Ricks v. Dist. of Columbia*, 634 A.2d 403, 406 (D.C. 1993). With regard to the duty the District owed Lindsey, it is settled D.C. law that "a defendant may be liable for harm caused by the criminal act of another only if the crime was *particularly foreseeable*." *Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 262 (D.C. 2003) (emphasis added). This is a "heightened" standard of foreseeability, which ordinarily may not be satisfied with "generic information such as crime rates." *Id.* Moreover, because of the "sliding scale" reflected in D.C. case law, the District owed Lindsey only a basic duty of care -- for the same reason it owed him only a basic duty of care under the Constitution -- Smith must adduce "specific evidence of foreseeability." *Id.* at 264.

As we have seen, Smith has not satisfied the ordinary requirement of foreseeability necessary to establish proximate causation, let alone the heightened standard of foreseeability a plaintiff must meet under D.C. law in order to hold one party responsible in damages for the criminal act of another. The District was not on notice that Lindsey was generally in danger, and Smith points to no specific evidence that he was in peril of being the victim of a targeted murder. Accordingly, Smith's negligence claim against the District should fail.

## III. Conclusion

Even under the deferential standard we accord a jury verdict, it should be apparent that Smith has proven neither her constitutional claim for due process nor her common law claim for negligence. That her grandson was murdered is a tragedy. Why it happened is a mystery. But this much is certain: The District was not deliberately indifferent to Lindsey's well-being,

nor could it have foreseen he would be executed by an assassin.
I therefore respectfully dissent.