FUENTES, Circuit Judge,
with whom Judges JORDAN, VANASKIE, and NYGAARD join, and with whom Judge AMBRO joins as to part I, dissenting:
Over the course of several months, minors Brittany and Emily Morrow (the “Morrows”) suffered repeated physical and verbal assaults at the hand of a bully and *187 her friend, classmates in their public school in the Blackhawk School District in Pennsylvania (the “School” or “Black-hawk”).[1] The attacks included racially motivated assaults, verbal harassment of the Morrows in their home and on-line, attempting to push Brittany down a flight of stairs during school hours, and violent physical assaults on the Morrows at a School football game and on a school bus. Early on in this history of attacks, the bully was charged by the authorities with assault and making terroristic threats, was eventually placed on probation by the Court of Common Pleas, and was ordered to have no contact with Brittany. School officials were aware of these proceedings and had even suspended the bully for a brief period before she was placed on probation. Nevertheless, the bully was readmitted to School and some of the instances of violence described above occurred after her return. Eventually, the bully was adjudicated a juvenile delinquent and was again ordered to have no contact with Brittany. It also bears noting that many of the bully’s attacks occurred after Black-hawk officials had suspended the Morrows themselves for their involvement in the dispute, pursuant to the School’s “No Tolerance Policy.” It is reasonable to infer that, to the Morrows, application of the policy (which could have led to their permanent expulsion from the School) meant that they risked disciplinary action should they act to forestall attacks by the bully. Despite all this, Blackhawk officials refused to protect the Morrows from danger. When the Morrows sought help, they were told that the School would not guarantee their safety and, surprisingly, that their best course of action would be to find another school.
The Morrows are today left without a legal remedy for these actions. That future victims may seek relief from State legislatures, Majority Op. at 175-77, is of no help to them. “We do not adequately discharge our duty to interpret the Constitution by merely describing the facts [of these cases] as ‘tragic’ and invoking state tort law.” Doe ex rel. Magee v. Covington Cnty. Sch. Dist., 675 F.3d 849, 886-87 (5th Cir.2012) (en banc) (Weiner, J., dissenting) (citing Maldonado v. Josey, 975 F.2d 727, 735 (10th Cir.1992) (Seymour, J., concurring)).
Worse, today’s result is wrong as a matter of law. The legal and factual relationship between students and school officials during the school day, the coercive power that the state exercises over school children, and the role of the school officials in this case in placing the Morrows in greater danger, all dictate a result contrary to that reaffirmed and endorsed today.
I. The Existence of a “Special Relationship” Between The Morrows And Blackhawk School Officials
Twenty years ago, a narrow majority of this Court decided in D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir.1992) (en banc), that school officials have no obligation to protect school children from any physical *188 harm that may occur during school hours. Close analysis of the reasoning in Middle Bucks, however, shows that its entire legal basis was a misunderstanding of the Supreme Court’s seminal decision in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and of the relationship between the State and school children.
Reconsidering the coercive power that the State exercises over students, and the ways in which the State may restrict a student and his or her parents’ ability to protect that student from harm, we would conclude, like Judge Becker in Middle Bucks, that a special relationship may exist under certain narrow circumstances. See Middle Bucks, 972 F.2d at 1384 (Becker, J., dissenting). As pertains to this case, we would hold that Blackhawk undertook a limited obligation to keep the Morrows safe from harm at the hands of the bully because Blackhawk compelled school attendance, exercised extensive control over not only the student victims but also the specific threat at issue in the case — a violent bully subject to two restraining orders that victimized the Morrows over an extended period of time — and enforced school policies that prevented the Morrows from being fully able to protect themselves.
A.
As the majority outlines, in DeShaney the Supreme Court held that the Due Process Clause of the Fourteenth Amendment did not impose on the State of Wisconsin a blanket affirmative duty to interfere with the parental relationship between Randy DeShaney and his son Joshua,, and that therefore the State was not liable for harm the child suffered or was likely to suffer at the hands of his father. 489 U.S. at 195-96, 109 S.Ct. 998. The Court noted that an affirmative duty to protect arose only if there was a “special relationship” between the State and the imperiled individual, and that the State’s actions in taking temporary custody of Joshua and later returning him to his father, who was known to be abusive, were insufficient to give rise to such a relationship. Id. at 197-198, 109 S.Ct. 998.
The DeShaney Court referred to two cases that exemplify when a State enters into a special relationship. In Estelle v. Gamble, the Court had held that the Eighth Amendment imposed a duty to provide “adequate medical care” to prisoners given that they were unable to procure such care on their own “by reason of the deprivation of [their] liberty” by the State. Id. at 198-99, 109 S.Ct. 998 (quoting Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). And in Youngberg v. Romeo, the Court extended Estelle’s holding to require States to provide “involuntarily committed mental patients with such services as are necessary to ensure their ‘reasonable safety’ from themselves and others.” Id. at 199, 109 S.Ct. 998 (quoting Youngberg v. Romeo, 457 U.S. 307, 314-325, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).
Three years later, in Middle Bucks, we held that a “special relationship” did not exist between the State and school children, despite Pennsylvania’s compulsory education laws. 972 F.2d at 1371-73. As the majority recognizes today, the crux of our holding in Middle Bucks is that although the State exercises in loco parentis authority over children during school hours, the parents “remain the primary caretakers” over their children. Id. at 1371. In other words, Middle Bucks’ central premise is that a student, unlike a prisoner or the involuntarily committed, is not subjected to “full time severe and continuous state restriction.” Id.
But Middle Bucks provides no basis to conclude that DeShaney endorses an all- *189 or-nothing approach that turns on the existence of “round-the-clock” physical custody or on who remained the primary caregiver. See id. at 1379 (Sloviter, C.J., dissenting). Were the existence of either fact disposi-tive in Estelle, Youngberg, or even DeSha-ney itself, the Supreme Court surely would have said so explicitly. Instead, the Court explained that the common thread that unites Estelle and Youngberg is that a person is left “unable to care for himself’ by the “State’s affirmative act of restraining the individual’s freedom to act on his 'own behalf.” DeShaney, 489 U.S. at 200, 109 S.Ct. 998. The Court contrasted these situations to Joshua’s case by noting that returning Joshua to his father’s care did not constitute a restraint on his liberty to act on his own behalf. Id. The result in DeShaney is also explained by other facts, none of which turns on the lack of permanent physical custody: (1) that the “harms Joshua suffered occurred not while he was in the State’s custody;” (2) that the State “played no part in [the] creation” of the danger; and (3) that the State did not do “anything to render [Joshua] any more vulnerable.” Id. at 201, 109 S.Ct. 998.[2]
Because DeShaney itself did not provide the Middle Bucks majority with the absolute physical custody requirement, it relied on our prior decision in Philadelphia Police to conclude that DeShaney “set[ ] out a test of physical custody.” Middle Bucks, 972 F.2d at 1370 (citing Philadelphia Police & Fire Ass’n v. Philadelphia, 874 F.2d 156, 167 (3d Cir.1989)). Philadelphia Police had held that the State is not responsible for harm suffered by mentally handicapped individuals living at home, but it neither requires absolute physical custody nor turns on who the primary caregiver was. See Philadelphia Police, 874 F.2d at 167. Indeed, the case arguably implies that the State could be held liable for harm suffered by the individual while in temporary State custody. To be sure, Philadelphia Police and DeShaney foreclose any argument that the State is responsible for the safety of school children while in their own homes. But Philadelphia Police does not bridge the gap between DeShaney and an “absolute physical custody” requirement. Thus, it is clear that Middle Bucks’ gloss on DeShaney has no doctrinal foundation.[3]
B.
As the Supreme Court has observed, “[t]he State exerts great authority and co *190 ercive power through mandatory attendance requirements.” Edwards v. Aguillard, 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Reexamining the relationship between school children and the State in light of our understanding of De-Shaney leads to the inescapable conclusion that a special relationship may exist under certain specific circumstances.
In Pennsylvania, attending school is obligatory for children between the ages of eight and seventeen. 24 Pa. Stat. Ann. §§ 13-1326, 1327(a). Parents who fail to comply with these mandates face punishment as severe as imprisonment. Id. § 1333(a)(1).[4] Once the State compels attendance, it has considerable power over the child’s well-being as a matter of both law and fact. Pennsylvania’s in loco par-entis statute gives school officials “the same authority as to conduct and behavior over the pupils attending ... school ... as the[ir] parents.” Id. § 13-1317. And “[t]he rights and liabilities arising out of an in loco parentis relationship are ... exactly the same as between parent and child.” T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913, 916-17 (2001). This may be an understatement. A parent may punish a child for “incorrigibility,” but he may not, like the State, initiate juvenile delinquency proceedings. 24 Pa. Stat. Ann. § 13-1338.
It is true that parents retain the ultimate legal custody and responsibility over the child. But a parent’s immediate ability to protect his child is significantly curtailed during the time the child is in the physical custody of school officials. During that time, the State may well be the only caregiver to which children may turn to for help. Middle Bucks attempted to dilute the strength of this reasoning by noting that it cannot “be denied that a parent is justified in withdrawing his child from a school where the health and welfare of the child is threatened.” 972 F.2d at 1371 (quoting Zebra v. Sch. Dist. of Pittsburgh, 449 Pa. 432, 296 A.2d 748, 751 (1972)). But this overlooks that this right is extremely narrow, limited to situations in which a child’s safety is “positively and immediately threatened.” Commonwealth ex rel. Sch. Dist. of Pittsburgh v. Ross, 17 Pa.Cmwlth. 105, 330 A.2d 290, 292 (1975). In Ross, a parent could not withdraw a student although the child had been pushed into a wall and cut with scissors by other students. Id. at 291. And in Zebra, a parent could not withdraw his child even though he was threatened with physical harm “if any reports were made to the school authorities” regarding a bully’s extortion attempt, and “[m]any of the ... students became ill, developed nervous conditions, required medical treatment, [and] were afraid while attending [the school].” Sch. Dist. of Pittsburgh v. Zebra, 4 Pa.Cmwlth. 642, 287 A.2d 870, 872 (1972), order reversed by Zebra, 296 A.2d 748. Thus, a Pennsylvania parent appears not to be free to withdraw a child absent the most egregious conditions. Indeed, “[m]ost parents, realistically, have ... little ability to influence what occurs in the school.” Morse v. Frederick, 551 U.S. 393, 424, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (Alito, J., concurring).
*191 The State’s authority over children while they are in school extends beyond their well-being and is nearly absolute, covering what they may wear and how they may behave. See generally 24 Pa. Stat. Ann. § 13-1317.3; 22 Pa.Code § 12.2 (detailing student responsibility to engage in “conscientious effort in classroom work and homework”). Officials may “proceed against said child before the juvenile court” for misbehavior. 24 Pa. Stat. Ann. § 13-1338. At thirteen, the child is also subject to penalties for failure to comply with compulsory school laws. Id. § 13-1333(b).[5]
The Blackhawk Student Handbook reflects these restrictions on students’ liberty and on their parent’s ability to act on the child’s behalf, and goes further by regulating student conduct in classrooms, school buses, cafeterias, and sporting activities; providing that students missing class will be required to attend the School for detention on Saturdays and that officials “may consider corporal punishment” upon a student; and prohibiting students from having cell phones. See Blackhawk High School Student Handbook “Statement of Student Behavior,” available at http:// blackhawk.bhs.schoolfusion.us/modules/ cms/pages.phtml?pageid=41593 (hereinafter “Handbook”); see also 24 Pa. Stat. Ann. § 13-1317.[6]
In DeShaney, the State simply left Joshua where it found him; he was not harmed while in the State’s physical custody or by anyone or anything over which the State had any immediate authority. Here, by contrast, the State affirmatively removed the children from their parents’ custody for a period of time, limited what both the children and the parents could do respecting the children’s safety during that period, and exercised control over a continuous threat the children faced over an extended period of time. This is enough to hold that a special relationship existed between the School and the Morrows. But if more were needed, one may look at cases involving the special relationship between the State and children it places in foster care.
Since Middle Bucks, several Courts of Appeals have answered the question left open by the Supreme Court in DeShaney regarding the existence of a special relationship between the State and the children it places in foster homes. See 489 U.S. at 201 n. 9, 109 S.Ct. 998. These courts have held that a special relationship exists in such cases because the State, in placing a child in foster care, “renders the individual substantially dependent upon the state ... to meet [his or her] basic needs.” Nicini v. Morra, 212 F.3d 798, 808 (3d Cir.2000) (en banc) (quotation marks and citation omitted); see also *192 Lintz v. Skipski, 25 F.3d 304, 305 (6th Cir.1994); Norfleet v. Ark. Dep’t of Human Servs., 989 F.2d 289, 293 (8th Cir.1993); Yvonne L. v. N.M. Dep’t of Human Servs., 959 F.2d 883, 893 (10th Cir.1992).
Our own case, Nicini, involved a child who was not in the State’s absolute care but was placed in a foster home. The child’s parents had signed a foster care placement agreement with the State, and the State permitted the child to stay on a temporary basis with another family, the Morras, after the child ran away from home. The child sued the State on the theory that it had failed to sufficiently investigate the Morras, whom he alleged sexually abused him. Although we “reeog-nize[d] that the analogy between foster children ... and prisoners and institutionalized persons” from Estelle and Young-berg was “incomplete,” and that foster children “enjoy a greater degree of freedom and are more likely to be able to take steps to ensure their own safety,” we held that a special relationship existed because the child was effectively in State custody and was “substantially dependent” on the State for his safety. 212 F.3d at 808 (quotation marks omitted).[7]
Nicini thus “discredit[s]” not just the “underlying reasoning” of Middle Bucks, but also its reading of DeShaney. Citizens United, 130 S.Ct. at 921 (Roberts, C.J., concurring) (explaining that “stare decisis does not control” when the “underlying reasoning” of precedent in question has been “discredited”). Nicini makes clear that physical custody cannot be the lynchpin of a DeShaney special relationship because the child there was not under the State’s control at the time the harm occurred. Moreover, the State in Nicini was not the primary caregiver. As the D.C. Circuit has recognized, the result and reasoning in the foster care cases have thus created “tension [with the] public school cases” because “[b]oth involve state constriction of a child’s liberty ... yet only the former triggers DeShaney custody.” Smith v. District of Columbia, 413 F.3d 86, 96 (D.C.Cir.2005). And Smith itself demonstrates that the fact that children return to their parents at the end of the school day is not dispositive. There, the Court held that a State has a special relationship with juvenile delinquents the State places in an “independent living” youth program, but over which it exerts neither absolute physical control nor supervision. See id. at 94.[8]
*193 Moreover, not only do these cases provide reason to revisit the legal underpinning of Middle Bucks, they provide further support for holding that a special relationship exists in this case. Here, unlike in Nicini or DeShaney, the State had custody of the children at the time of the injury in question, and the children were “substantially dependent” on the State for their safety during school hours, despite the existence of other caregivers. Nicini, 212 F.3d at 808 (quotation marks omitted). Like the children in Smith, the Morrows were technically free to “come and go” from school after certain hours but “risk[ed] punishment” for “failing] to obey [the State’s] restrictions on [their] ... freedom” while in school. Smith, 413 F.3d at 94. If anything, the existence of a special relationship is clearer here than in Nicini because the State in this case had physical custody over both the victim and the aggressor and was thus uniquely positioned to protect the child from harm. Neither factor existed in Nicini or in De-Shaney. Fairly read, the additional element of control that existed in the relationship between the State and Nicini that did not exist in DeShaney is that in Nicini the State entered into a temporary agreement with Nicini’s parents pursuant to which the parents consented to have their son placed in foster care. More is present here. Compulsory schooling laws, together with the restrictions on parents’ and their children’s ability to free themselves from State control, arguably impose on the State a greater obligation here than that which it undertook in Nicini.
The majority seizes on the temporary nature of the student/State relationship and also attempts to distinguish Nicini and Smith on the ground that parents remain the primary caregivers over school children. But this fact does not negate that during school hours the State has the “immediate [ ] responsibility for the child’s wellbeing.” Nicini, 212 F.3d at 808. In our view, this fact demonstrates, at most, that the difference between the State’s relationship with the Nicini children and schoolchildren is a difference in degree, not kind, and suggests that the proper course is to impose a constitutional duty on schools only under limited circumstances. See Middle Bucks, 972 F.2d at 1384 (Becker, J., dissenting). In Middle Bucks, Judge Becker found the existence of a special relationship based on the state’s compulsory attendance laws, the student’s disability, and the “affirmative steps [the school took] to confine the student to situations where she was physically threatened.” Id. Under the circumstances before us — Pennsylvania’s compulsory schooling laws, the existence of the restraining orders that prohibited contact between the bully and the Morrows, the fact that the School had custody and control over the very threat that harmed the Morrows, and the enforcement of the “No-Tolerance” Policy, all suggesting that the Morrows’ ability to protect themselves was limited — we “have no difficulty deciding” that a special relationship arose between the School and the Morrows. Id.
Restrictions on a person’s liberty to protect him-or herself from danger are the lynchpin of DeShaney. See 489 U.S. at 199-201, 109 S.Ct. 998. An approach that abandons Middle Bucks’ doctrinally unsound requirements and focuses on whether a State substantially restricted a student’s ability to defend herself from a particular danger, in addition to the general restraints on liberty imposed by compulsory schooling laws, is therefore more in line with DeShaney and simply makes more sense. Adopting such an approach and considering the specific circumstances of this case, we would hold that the Complaint has adequately pled the existence of a special relationship between the Mor *194 rows and the School vis-a-vis the bully, and remand the case for discovery on that claim.[9]
C.
Today’s majority does not quarrel with the foregoing or fully reject the dissenters’ reasoning in Middle Bucks. Majority Op. at 169 (instead calling the Middle Bucks dissent “compelling”). Nevertheless, the Court refuses to revisit Middle Bucks, asserting that the matter has been settled by dictum in a decision of the Supreme Court. But neither that comment nor principles of stare decisis preclude us from revisiting Middle Bucks or control the outcome of this case.
1.
In Vemonia School District 47J v. Acton, the Supreme Court upheld under the Fourth Amendment a school policy requiring athletes to submit to drug tests. The Court relied on the lowered expectations of privacy that students have in schools, because they are “committed to the temporary custody of the State.” 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). The Court commented that it did not mean to “suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional ‘duty to protect’ ” Id. at 655, 115 S.Ct. 2386 (citing DeShaney, 489 U.S. at 200, 109 S.Ct. 998). Seizing on this language, the majority concludes that “it is difficult to imagine a clearer or more forceful indicator of the Court’s interpretation of its holding in DeShaney.” Majority Op. at 170.
But the Vemonia dictum cannot bear the great weight the majority places on it.[10] Simply put, this case is not a “general matter.” Vemonia, 515 U.S. at 655, 115 S.Ct. 2386. The School administrators here had custody of a bully, who was prohibited from contact with Brittany Morrow by two court orders. Despite the State’s *195 knowledge of a very specific, continuing, and serious threat against a particular student, the School failed to prevent subsequent attacks and instead took action against the victims themselves pursuant to the “No Tolerance Policy.” When faced with a specific request for help, the School told the Morrows that it could not offer assistance, and even suggested it would be best if they, not the bully, left and attended another school.
To be sure, we do not “lightly ignore” Supreme Court dicta, Majority Op. at 12, and the Vemonia dictum undoubtedly “invites some caution,” Hasenfus v. LaJeunesse, 175 F.3d 68, 71 (1st Cir.1999). But we also ought not to stretch dicta beyond the specific question it controls, so as to curtail constitutional rights. While the Vemonia dictum precludes us from holding that school districts have as “a general matter” a duty to protect students, it does not foreclose finding a special relationship under specific circumstances.[11]
2.
Nor do we lightly suggest that our precedent be overturned. But even assuming that the same stare decisis concerns that cabin the Supreme Court’s discretion to revisit its own precedent apply with equal force to the Courts of Appeals, those principles do not stand in the way of revisiting Middle Bucks.
We should revisit Middle Bucks because its underlying premise, that the special relationship test turns on the existence of permanent physical custody, was clearly erroneous and set our jurisprudence astray from the contours of the special relationship test. See supra Part I.A. The fact that the majority does not defend the outcome of Middle Bucks as standing on its own suggests that the decision remains sufficiently controversial as to counsel “a greater willingness to consider new approaches capable of restoring our doctrine to sounder footing.” Citizens United, 130 S.Ct. at 922 (Roberts, C.J., concurring). Even the Supreme Court, when it “has confronted a wrongly decided, unworkable precedent calling for some future action ... [,] ha[s] chosen ... to overrule the precedent.” Payne v. Tennessee, 501 U.S. 808, 842-A3, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (Souter, J., concurring).[12]
In addition, although the record before us on this question is bare, one might also argue that at least some factual developments since Middle Bucks have-further undercut its rationale and provide additional reasons to reexamine it. The proper question is whether Middle Bucks ’ assumptions about the level of control that schools exert over students have been challenged. There are now abundant examples of schools exercising greater control over students, ranging from technology tracking student movements at all *196 times to ensure they are in class, see Maurice Chammah and Nick Swartsell, Student IDs That Track the Students, N.Y. Times, Oct. 6, 2012, http://nyti.ms/ThvbFq, to monitoring online social media activity within and outside school premises, see, e.g., J.S., 650 F.3d at 915, and, in the wake of recent tragic school shootings, locking classrooms in further restriction of student movement. See, e.g., Stephen Ceasar and Howard Blume, To lock classroom doors or not?, Los ANGeles Times, Jan. 13, 2013, http://soc.li/2N96T3f (noting increase in locked classrooms in the wake of the New-town, Connecticut shootings, and how such measures have resulted in other problems such as an instance of a teacher sexually assaulting students).[13] Stare decisis does not require us to definitively settle the questions raised by these new circumstances, nor does it preclude us from revisiting Middle Bucks while sitting en banc.
II. Blackhawk May Have Also Created the Danger That Harmed The Morrows
The Morrows also argue that the School may be liable under the “state-created danger” theory.[14] The majority concludes that this cause of action must also be dismissed because the Morrows have failed to plead an “affirmative act” by the School. Majority Op. at 177-78. Although we have acknowledged that “the line between action and inaction may not always be clear” in the context of these kinds of claims, Bright v. Westmoreland Cnty., 443 F.3d 276, 282 (3d Cir.2006), the consequence of that line becomes sadly clearer with the Court’s decision in this case: administrators who let violence run rampant can take shelter under the label “inaction.” Dereliction of duty becomes a school’s best defense. This outcome is contrary to an appropriate understanding of the state-created danger doctrine. Indeed, although the doctrine represents a narrow exception to DeShaney, the majority narrows the exception to the vanishing point by saying that school officials are free to ignore court orders and their own disciplinary code, enabling a pattern of physical abuse to persist.
To prove a state-created danger, a plaintiff must demonstrate that:
(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant’s acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state’s actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.
Id. at 281 (quotation marks and citations omitted). The first and third elements are *197 not in dispute in this case.[15] We therefore discuss the second and fourth elements to demonstrate that the Morrows’ complaint adequately pleads this cause of action.[16]
A.
The second prong of the state-created danger test sets “deliberate indifference” as “[t]he level of culpability required to shock the conscience ... in cases where deliberation is possible and officials have time to make unhurried judgments.” Sanford v. Stiles, 456 F.3d 298, 309 (3d Cir. 2006) (quotation marks omitted). The “deliberate indifference” formulation applies here because the decision with respect to the bully and the Morrows was neither “split-second” nor made in a “matter of hours or minutes,” id. at 310 (citation omitted), but rather was made and sustained over eight months stretching from January to October 2008.
In addition, the Complaint here .supports an inference of deliberate indifference on the part of the School principal, Balaski. Balaski knew that the bully was not permitted to contact the Morrows. Moreover, the Handbook mandates some action by officials in response to students who commit “Level IV” offenses, which include assault and battery, and arguably calls for their expulsion. However, Bala-ski ignored the import of the no-contact orders and decided not to abide by the school’s own Disciplinary Code. His decisions are alleged to have put the bully in proximity to and contact with the Morrows, despite ample reason to believe the bully would continue to assault the Morrows. Consequently, they have adequately pled deliberate indifference and satisfied the second prong of the state-created danger theory.
B.
Under the fourth prong of the theory, “liability ... is predicated upon the states’ affirmative acts which work to the plaintiffs’ detriment in terms of exposure to danger.”[17] Bright, 443 F.3d at 282 (quot *198 ing Middle Bucks, 972 F.2d at 1374). But it is not easy to discern from our cases what constitutes an affirmative act and what does not.
In Kneipp v. Tedder, we held that there was a substantive due process violation when police stopped an intoxicated couple on the street and then permitted the wife to go home alone, resulting in her fall down an embankment and ultimate death. 95 F.3d 1199, 1211 (3d Cir.1996). Then, in Rivas v. City of Passaic, we held liable emergency medical technicians (“EMTs”) who told police officers that a man in the midst of a seizure had assaulted them but did not inform the officers of the man’s medical condition. 365 F.3d 181, 195 (3d Cir.2004). We said that the state had created a danger in Kneipp because the defendants “used their authority as police officers to create a dangerous situation or to make [the victim] more vulnerable to danger [than] had they not intervened.” 95 F.3d at 1209. In Rivas, we aggregated an earlier action (the EMTs’ call that brought the police) with the inaction that was the actual cause of harm (the failure to inform the police of the victim’s condition) and decided it was sufficient because such sequence “created an opportunity for harm that would not have otherwise existed.” 365 F.3d at 197.
As these cases demonstrate, virtually any action may be characterized as a failure to take some alternative action or vice-versa. See, e.g., Covington Cnty., 675 F.3d at 864, 866 (describing the police officers in Kneipp as having “sent” the victim home alone, but recasting parents’ allegation that a school released their child to an unauthorized person in violation of school policy as a “failure to adopt a stricter policy”).[18]
Moreover, any conduct pled as the source of a state-created danger is likely to include a combination of action and inaction, depending on how far back in the causal chain a court goes. See Bright, 443 F.3d at 291 (Nygaard, J., dissenting) (“By cabining Bright’s claim based solely on an ensuing delay in taking action, the majority lops off the initial affirmative act so it can conclude that there was no affirmative act.”). Indeed, in Kneipp and Rivas, the immediate harm to the victims was due to the defendant’s failure to act. Therefore, the better way of understanding these cases, contrary to the majority’s embrace of the “affirmative act” requirement today, is to recognize that “the dispositive factor appears to be whether the state has in *199 some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act.” Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 915 (3d Cir.1997).[19]
The majority in Bright suggested that there is “no conflict” between the “use of authority” and “affirmative act” formulations of the fourth prong of the state-created danger test because “state actors cannot use their authority to create ... an opportunity [for injury to the plaintiff] by failing to act.” 443 F.3d at 283 n. 6 (quotation marks omitted). But that statement is wrong both linguistically and logically. It is wrong linguistically because authority is a broader concept than action. See Ye v. United States, 484 F.3d 634, 639-40 (3d Cir.2007) (treating “affirmative action” as a specific instance of the “exercise of authority”). And it is wrong logically because state authority necessarily brings with it discretion whether to take specific actions, and the decision to take one action over another — or to take no action at all— is itself an “affirmative exercise of authority” that may carry serious consequences. In many, if not most, state-created danger cases, the state actor will have made a decision to act in the context of some set of policies. For example, police departments have procedures with respect to the enforcement of restraining orders, and their enforcement decisions must be viewed in the context of those policies. See, e.g., Sheets v. Mullins, 287 F.3d 581, 589 (6th Cir.2002) (considering sheriffs liability in the context of court-mandated process for restraint orders); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir.1990) (considering whether police chief interfered with standard police procedures with respect to enforcement of restraint order).
The exercise of authority by school officials must similarly be viewed in the context of policies and procedures whose express purpose is to protect students while they are under school control. If a school exercises its authority to contravene a policy designed to protect students, then “the school officials’ role [is] not merely passive or simply negligent.” Covington Cnty., 675 F.3d at 882 (Wiener, J., dissenting). It cannot rightly be said of a school’s decision to exercise its authority to violate or suspend a policy that would protect a student that “it placed [that student] in no worse position than that in which he would have been had [the state] not acted at all.”[20] DeShaney, 489 U.S. at 201, 109 *200 S.Ct. 998. As we said in Middle Bucks, “[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.” 972 F.2d at 1374 (citation omitted). The majority’s argument that our view of the state-created danger exception threatens to “swallow the rule,” Majority Op. at 27, ignores the key role played by school disciplinary policies, as well as other policies that cabin officials’ discretion, in our formulation of the state-created danger exception.
Ultimately, the misguided effort to equate “affirmative act” and “exercise of authority” begs the real question at issue: whether a state actor increased the risk someone faced. Regardless of whether a state-created danger requires either an “affirmative act” to place an individual in danger or an “exercise of authority” that renders him more vulnerable to danger, the facts pled in the Complaint, accepted as true, together with the reasonable inferences we are required to draw, satisfy either standard.
While the majority reasons there was no affirmative act on the part of the School, it may be inferred from the Complaint that the School did do something. Principal Balaksi engaged in decision-making as to the implementation of a provision of the Disciplinary Code. The Disciplinary Code states that Level IV offenses “are clearly criminal in nature and are so serious that they always require administrative action resulting in the immediate removal from school.” Compl. ¶ 16 (emphasis added). Therefore, it may be reasonably inferred that the School affirmatively exercised its discretion to permit the bully to return to school after she was adjudicated a delinquent and made the subject of the two no-contact orders. Moreover, the School conceded at oral argument that the principal could have initiated the hearing process that would have been necessary prior to permanently expelling the bully from the School, but that he did not do so. Consequently, it is fairly inferable from the Complaint that there were internal discussions that preceded the decision to decline enforcement of the Disciplinary Code against the bully. Those discussions, and that decision, put the Morrows at a heightened risk of harm and satisfy the fourth element of the state-created danger test.[21]
The majority’s conclusion to the contrary turns on its assumption that the bully would have continued to attend school had she not been suspended. See Majority Op. at 177-78. But this is plainly incorrect in light of the Disciplinary Code that obligated School officials to do something about the bully’s continued criminal behavior after her return from school. Without explanation, the majority “decline[s] to hold that a school’s alleged failure to enforce a disciplinary code is equiv *201 alent to an affirmative act.” Id. at 178. Precisely because, in choosing to ignore that mandate, the School officials contributed to the danger the Morrows faced, we would reach the opposite conclusion.
C.
Like Kneipp, this case presents “unique facts,” 95 F.3d at 1208, that distinguish it from Middle Bucks and set it apart from the majority of state-created danger cases that we have seen. In Middle Bucks, where the question was “extremely close,” 972 F.2d at 1374, we held that, “[a]s in DeShaney, ‘the most that can be said of the state functionaries ... is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.’ ” Id. at 1376 (quoting DeShaney, 489 U.S. at 203, 109 S.Ct. 998). But the high school principal here, Balaski, was not confronted with “suspicious circumstances.” He was confronted with a student who had been charged with assault and making terroristic threats and harassment, had been adjudicated a delinquent, had repeatedly attacked the Morrows over the course of several months, and had been the subject of two no-contact orders that were delivered to the School. And Balaski’s decisionmaking did not occur in a vacuum but instead operated under a Disciplinary Code and an Anti-Bullying Policy that the School was required to adopt by the Pennsylvania legislature. See supra note 20. In Middle Bucks, we said that the defendants “did not subject plaintiffs to an inherently dangerous environment,” 972 F.2d at 1375, but, here, Balaski’s decision not to expel the bully unquestionably subjected the Morrows to an inherently dangerous environment. This is evidenced by his own statement to the Morrows’ parents that the school “could not guarantee the safety” of their daughters. Compl. ¶20. The Morrows should therefore be permitted to take their state-created danger cause of action past the pleadings stage.
III. Conclusion
It has been suggested that the “elephant in the room” in cases of this nature is a desire by the federal courts to avoid becoming the forum for all disputes involving everyday schoolyard quarrels. See, e.g., Middle Bucks, 972 F.2d at 1384 (Sloviter, C.J., dissenting); Oral Arg. Audio Tr. 26:39-27:08 (Ambro, J.). But there exist sufficient evidentiary and procedural protections to assuage any concerns that a limited review of Middle Bucks will open the floodgates to all school-related litigation. See Middle Bucks, 972 F.2d at 1384 (Sloviter, C.J., dissenting). And to plead a plausible special relationship cause of action, the student must clear another hurdle by pointing to other circumstances beyond the restraints imposed ordinarily by compulsory schooling laws. Run-of-the-mill schoolyard fights, isolated or random acts of violence, or matters where a school played no part in exacerbating the threat, would likely not be covered.
But regardless of the efficacy of these devices, we ought not refuse to grant relief that is warranted simply to stem future litigation. While turning away the Morrows may be convenient as a matter of management of judicial resources or as a matter of school policy, it is neither expedient nor sound as a matter of constitutional law. The majority avers that students and concerned parents may seek redress from their legislatures, but concedes that the law as it exists today, at least in Pennsylvania, immunizes schools from such suits. See Majority Op. at 177 (citing Auerbach v. Council Rock Sch. Dist., 74 Pa.Cmwlth. 507, 459 A.2d 1376, 1378 (1983)). Perhaps students may seek *202 redress under other federal statutes for certain instances of pervasive or race-motivated harassment.[22] But these limited remedies will not be available for all cases, and we should not require that the level of attacks reach frightening extremes before school officials are required to intervene. “When claims like these fall through the cracks, § 1983 seems less than the powerful tool to vindicate constitutional rights it was designed to be.” Black v. Indiana Area Sch. Dist., 985 F.2d 707, 715 (3d Cir.1993) (Scirica, J., concurring).
Most ironically, today’s victory may be pyrrhic for school officials. To the detriment of schools’ ability to manage their own affairs, concerned parents could seek greater control and awareness over the moment-to-moment safety of their children, knowing that the school officials to whom they entrust them children are under no legal obligation to protect them from harm. Some parents may even take unilateral acts to protect their children. See, e.g., Ryan Raiche, Parents of boy who brought butcher knife to school say it was to defend himself from bullies, ABC Action News WFTS-TV, Jan. 14, 2013, http:// shar.es/jEG8P. At worst, schools may be unwittingly encouraging the law of the jungle to be the reigning norm. We hope this is not the case.
It cannot be denied that schools both create and regulate the conditions to which students are subject during the school day. When a State interrupts even temporarily the provision of care by a parent to a child, steps into the shoes of that parent, and restricts the ability of the child to defend herself from a specific threat, the State ought to be seen as incurring a narrow, concomitant responsibility to act as one would expect the child’s parents to act: to protect the child from that danger. The School’s explicit refusal to do so should give us more pause than it does today. Moreover, when a school official chooses not to remove a student who has committed violent acts against another student, despite policies that call for such removal, that official has surely placed the victim in a worse position than if the disciplinary policy had run its ordinary course. And when a school creates an atmosphere in which serious violence is tolerated and brings no consequence, it acts in a manner that renders all students more vulnerable.
We respectfully dissent.

. This appeal comes to us following the District Court's dismissal pursuant to Rule 12(b)(6). Therefore, all that is required is that the Complaint “contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.” III. Nat’l Ins. Co. v. Wyndham Worldwide Operations, Inc., 653 F.3d 225, 230 (3d Cir.2011) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotation marks omitted). "[W]e accept as true all allegations in the plaintiff’s complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant.” Monroe v. Beard, 536 F.3d 198, 205 (3d Cir.2008).

. Moreover, the duty assumed in Estelle was commensurate with the restriction the State had imposed on the individual’s liberty: a prisoner is restrained from seeking medical help on his own, so under Estelle the State must provide it. DeShaney, 489 U.S. at 198—99, 109 S.Ct. 998 (citing Estelle, 429 U.S. at 103-104, 97 S.Ct. 285). Estelle does not recognize a generalized duty to protect prisoners from all harm, despite the fact that prisoners are under the permanent physical custody of the State. And the only gloss on Youngberg provided in DeShaney was to note that because the mentally committed were less culpable than the incarcerated and “may not be punished at all,” the State takes upon itself a duty, broader than in Estelle, to keep such individuals safe. Id. at 199, 109 S.Ct. 998 (citation omitted). This analysis suggests that the Court favored a more nuanced look at the relationship between the individual and the State, certainly one more flexible than the rigid test of Middle Bucles.

. Middle Bucles ’ absolute physical custody requirement and its focus on who remains the victim’s primary caregiver also contrast sharply with our holding in Horton v. Flenory, 889 F.2d 454 (3d Cir.1989). In Horton, we held that a special relationship existed between the employees and the proprietors of a nightclub, who had been delegated law enforcement authority by the local police, and that there was a duty to protect an employee from harm while he was in the temporary physical custody of the owners. Id. at 458. Although we sat en banc in Middle Bucks, the Middle Bucks' majority’s failure to address Horton’s interpretation of DeShaney is significant. "[Rjeturning to the intrinsically sounder doctrine established in prior cases may *190 better serve the values of stare decisis.” Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 130 S.Ct. 876, 920, 175 L.Ed.2d 753 (2010) (Roberts, C.J., concurring) (quotation marks and citation omitted). We do not suggest that there is a "conflict” between today's analysis and Horton. See Majority Op. at 175-76. Horton merely illustrates that Mid-die Bucks’ absolute physical custody requirement was ill-advised and doctrinally unfounded.

. The State's first intrusion into the lives of its citizens in the school context may be considered to be when it enrolls all parents as the funders of public schools via taxation.

. That these measures are “inherent in the nature of the relationship of public schools and their pupils,” Majority Op. at 171, is of no moment. See also id. at 170-71. Restrictions on liberty are also "inherent” in the relationship between the State and the imprisoned or involuntarily committed, but the significance of such restrictions is not diminished by the fact that the State has a vested and even necessary power to impose them.

. Given the prohibition against students carrying means of communicating with their parents during school hours, which in 1992 represented a ban on pagers, it is obviously difficult, if not practically impossible, for a student to seek help from a parent during school hours. Middle Bucks largely overlooked this. 972 F.2d at 1372 (noting that "channels for outside communication were not totally closed” during school hours). Contrary to the majority’s suggestion, we do not question the wisdom of school policies aimed at student safety or discipline, see Majority Op. at 172 n. 14, and we doubt schools will change any policies to avoid liability under the narrow circumstances described here. But we look to those policies to better understand the nature of the relationship between students and the State.

. Middle Bucks places some emphasis on the fact that schools do not restrict a child’s ability to provide for his basic needs, see Middle Bucks, 972 F.2d at 1372, but this is not the proper rubric of analysis under DeShaney. The State did not restrict the individual's ability to provide for his basic needs in Youngberg or in the foster care cases. The individual's ability to do so was restricted by circumstances over which the State had no control and in which it played no part. At most, the State undertook some responsibility when it stepped into the lives of such individuals. So too in the school context. Minors are unable to provide for their basic needs without their parents on account of age. By compelling attendance in school, the State does not alter that reality, but does temporarily curtail a parent’s ability to be a caregiver, thereby undertaking that responsibility- — albeit a more limited one — in the same way it does in Youngberg and Nicini.

. Indeed, even though a student returns home after the school day, the State may continue to exercise some control over some of the student’s activities. See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915 (3d Cir.2011) (addressing propriety of school action under the First Amendment). If students have a cause of action under § 1983 against school administrators who attempt to discipline them for out-of-school internet postings as we held in J.S., then surely students also have a cause of action against school administrators who fail to protect them from in-school harms.

. I would also note that, in the school context, children are placed under State control for the undeniably important goal of "prepar[ing them] for citizenship in the Republic.” Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (citation omitted). This restraint on the liberty of students is justified by the State’s own overarching interest in education.
In addition, if it is unconstitutional to confine in unsafe conditions the mentally infirm, then surely it must be unconstitutional to refuse to protect from harm school children whose liberty the State restricts on its own accord. See DeShaney, 489 U.S. at 199, 109 S.Ct. 998 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional ... to confine the involuntarily committed — who may not be punished at all — in unsafe conditions.” (citation omitted)).

. That is particularly true because much of the dicta in Vemonia that both precedes and follows the language quoted by the majority points in the opposite direction. In framing the degree of control that public school officials exercise over their students, the Court began with the premise that "unemancipated minors lack some of the most fundamental rights of self-determination — including even the right of liberty in its narrow sense, i.e., the right to come and go at will.” 515 U.S. at 654, 115 S.Ct. 2386. The Court also noted that it had “rejected the notion that public schools ... exercise only parental power over their students,” a "view of things” that it said is "not entirely consonant with compulsory education laws.” Id. at 655, 115 S.Ct. 2386 (internal quotation marks omitted). And the Court "emphasized! ] that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults,” id, following its passing reference to DeShaney with a recitation of the various ways in which "school authorities ac[t] in loco parentis " and a statement that the nature of constitutional freedoms enjoyed by students "is what is appropriate for children in school.” Id. at 655-56, 115 S.Ct. 2386 (internal quotation marks omitted).

. Notably, one of the decisions by our sister Circuits cited by the majority specifically refuses to read the dictum in Vemonia to preclude finding a special relationship in the school context under all circumstances. See Hasenfus, 175 F.3d at 71-72.

. Moreover, Middle Bucks has been subject to criticism. See, e.g., Deborah Austern Col-son, Note, Safe Enough to Learn: Placing an Affirmative Duty of Protection on Public Schools under 42 U.S.C. § 1983, 30 Harv. C.R.C.L. L. Rev. 169, 183, 196 (1995) (denouncing "mechanical” analysis of the relationship between students and school officials, and suggesting that we should "make case-by-case, fact-intensive inquiries into state action”); Robert C. Slim, Comment, The Special Relationship Doctrine and a School Official’s Duty to Protect Students from Harm, 46 Baylor L. Rev. 215 (1994); Case Comment, Third Circuit Finds No Affirmative Duty of Care by School Officials to Their Students: D.R. v. Middle Bucks Area Vocational Technical School, 106 Harv. L. Rev. 1224 (1993).

. We do not contend that the limitations on students’ freedoms are comparable to those imposed on prisoners or the involuntarily committed. See Majority Op. at 170-71. The examples do show, however, that the relationship between school children and the State is far more intrusive than the relationship between Joshua DeShaney and the social services department, and that in some ways the relationship restricts the freedom of students, as a factual matter, more so than the relationship between the State and the children in Nicini and Smith.

. We and other Circuits derived this theory from the Supreme Court’s statement in De-Shaney that "[w]hile the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation.” 489 U.S. at 201, 109 S.Ct. 998.

. The first prong is satisfied by the two court orders directing the bully to have no contact with the Morrows, which were delivered to the School, because the threat posed by the bully was both “foreseeable” by the School and "fairly direct” as to the Morrows. The third prong is satisfied because the assignment of the Morrows to Blackhawk under the compulsory school attendance law made them part of a “discrete class of person subject to the potential harm” brought about by the School’s conduct.

. Because, as noted, this case comes to us from a ruling on a motion to dismiss, we must draw all reasonable inferences in the Morrows’ favor. Monroe, 536 F.3d at 205. If, based on the facts pled in the Morrows’ Complaint, "we cannot reasonably conclude at this juncture of the case that the harm ... came about by means apart from the state,” Middle Bucks, 972 F.2d at 1382 (Sloviter, C.J., dissenting), the Morrows should have the opportunity for discovery to determine the precise nature of the School’s conduct.

.It is worth noting that DeShaney does not actually compel the inclusion of the "affirmative act” requirement into the fourth element of the state-created danger test. When we first considered the state-created danger theory, we said that DeShaney holds "that a state’s failure to take affirmative action to protect a victim from the actions of a third person will not, in the absence of a custodial relationship between the state and the victim, support a civil rights claim.” Brown v. Grabowski, 922 F.2d 1097, 1100-01 (3d Cir.1990). However, DeShaney used the phrase "affirmative act” only to refer to state conduct sufficient to create a special relationship. See, e.g., DeShaney, 489 U.S. at 200, 109 S.Ct. 998. By contrast, in contemplating the possibility of a state-created danger, the Court simply suggested that the State must have "played [some] part” in the creation of that danger. Id. at 201, 109 S.Ct. 998. Much like the requirement that the State have absolute physical custody in the context of the special relationship test, the "affirmative act” element is our own addition, and one that is not *198 necessarily helpful to safeguarding constitutional rights.

. We also struggled with the "action/inaction” determination in Middle Bucles when we distinguished two cases in which the state indisputably created a danger by a failure to act. The first case was Horton, where a club owner empowered by the police to act as law enforcement beat up one of his employees while interrogating him about an alleged theft. The club owner then called a police officer who failed to remove the employee from the club owner's custody, despite evidence of severe physical mistreatment. We held that the police officer was potentially liable. See Horton, 889 F.2d at 458. In the other case, a minor was committed to a foster home based on a charge of assault and battery upon her father. The state later learned, but failed to disclose, the fact that the parents had fabricated the assault charge. The First Circuit held that the state was liable because its failure to disclose the false charge resulted in continued custody of the daughter in foster homes and other placements. See Germany v. Vance, 868 F.2d 9 (1st Cir.1989). We distinguished those cases from Middle Bucles, in which we held that a failure to act did not support a state-created danger claim, because we "read both cases to turn upon a finding of 'functional' custody,” 972 F.2d at 1375, that we believed did not exist in Middle Bucles, but we provided no justification for that distinction.

. Given that, as noted, the "affirmative act” requirement is not actually present in DeSha-ney, it is not surprising that we have not always required an "affirmative act” as part of the fourth prong of the state-created danger test. As Judge Nygaard noted in Bright, "[s]ince Kneipp ... enunciated our state-created danger test, not one of our cases [had] inserted the word 'affirmatively’ into the fourth element of the test” prior to Bright, 443 F.3d at 288 (Nygaard, J., dissenting). Rather, we consider whether "the state actor used his authority to create an opportunity for danger that otherwise would not háve existed.” Kneipp, 95 F.3d at 1208; see generally Bright, 443 F.3d at 288 (Nygaard, J., dissenting) (collecting cases). Judge Nygaard rightly observed in Bright that these cases "shifted away from inquiring into the existence of affirmative acts as a standard to establish the fourth element of our test for a compelling reason: to so hinge our inquiry would center us squarely in the troublesome decisional thicket governing the distinction between action and inaction." Bright, 443 F.3d at 289.

. One might argue that holding public schools liable under the state-created danger theory based on their own protective policies creates an incentive to eliminate or weaken those policies. However, those policies are typically mandated by the State. For example, Pennsylvania requires that each school "adopt a code of student conduct that includes policies governing student discipline.” 22 Pa.Code § 12.3(c). Also, under its "Safe Schools” statute, Pennsylvania requires each school to have a policy relating to bullying *200 that must be incorporated into its code of student conduct and disciplinary code. 24 Pa. Stat. Ann. § 13-1303.l-A(a). Moreover, we doubt that any rational school district will opt for eliminating policies designed to protect children, and permit teachers to abandon children to danger, simply to avoid liability in egregious cases such as this.

. One might also reasonably infer that the School officials affirmatively acted in a way that increased the danger to the Morrows by putting them and the bully in the same lunch room or allowing the bully to board the Morrows' school bus despite the fact that it did not serve her home route. See, e.g., Compl. ¶ 18. The School argues that the incident on the school bus cannot constitute the basis of liability because the Morrows were less restrained by the School when they were on the bus. This argument confuses the physical restraint component of the special relationship test with the state-created danger theory.

. See, e.g., Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655 (2d Cir.2012) (permitting cause of action to proceed against school district under Title VI for permitting plaintiff to be bullied on account of race); Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194 (3d Cir.2004) (recognizing claim against school based on the Individuals with Disabilities Education Act). Notably, the existence of alternative causes of action further undercuts implicit reliance on a desire to shield school officials from suits as a reason to depart from sound constitutional principles. Bullying-related suits will continue as long as the issue is in the public eye regardless of today’s decision.